809 So.2d 1040 (2001)
SOUTHERN CASING OF LOUISIANA, INC.
v.
HOUMA AVIONICS, INC.
Houma Avionics, Inc.
v.
Southern Casing Of Louisiana, Inc.
Nos. 2000 CA 1930, 2000 CA 1931.
Court of Appeal of Louisiana, First Circuit.
September 28, 2001.
*1042 Timothy Ellender, Houma, Counsel for Appellee Southern Casing of Louisiana, Inc.
Joseph Bartels, Defendant/Appellant, New Orleans, Counsel for Appellant Houma Avionics, Inc.
Before: GONZALES, KUHN, and CIACCIO[1], JJ.
KUHN, J.
This appeal arises out of an informal business arrangement entered into by Southern Casing of Louisiana, Inc. and Houma Avionics, Inc. Pursuant to the arrangement, Southern Casing constructed an airplane hangar on property that Houma Avionics leased from the Houma/Terrebonne Airport Commission. Southern Casing also paid to have two fuel tanks and their pumping systems installed on the leased property. For a number of years, the parties shared occupancy of the hangar and the use of the tanks. Ultimately, the parties had a dispute over who owned the hangar and tanks, and Houma Avionics demanded that Southern Casing pay rent for its continued occupancy of the hangar. As a result, Southern Casing removed its aircraft from the hangar and filed a petition for judicial sequestration, asserting its ownership claim to the hangar, tanks and pumping systems.[2] Houma Avionics answered *1043 the sequestration suit and reconvened urging its ownership claims and asserting allegations of breach of contract, fraud, and unjust enrichment. Also, in a separate suit, Houma Avionics filed a petition for declaratory judgment seeking to be declared owner of the items in question. Upon Houma Avionics' motion, the suits were consolidated for trial. Southern Casing later amended its petition to allege that Houma Avionics' actions had caused it monetary damage.
In response to the petition for declaratory judgment, the court declared Houma Avionics to be the owner of the hangar[3] but also ordered that Houma Avionics pay $114,100, together with legal interest from August 14, 1998, to Southern Casing. The amount represented the trial court's determination of the value of the hangar at the time of trial, plus an award of interest from the date of the petition for judicial sequestration. The court also declared that at the time the action was instituted, Houma Avionics did not own either of the two fuel tanks. The court recognized, however, that ownership of the aviation gas fuel tank was later conveyed to Houma Avionics.[4]
In response to the petition for judicial sequestration, the trial court ruled in favor of Southern Casing and against Houma Avionics, declaring that at the time the action for judicial sequestration was instituted, Southern Casing was the owner of the two fuel tanks and pumps. This judgment also recognized that after the suit was filed, Houma Avionics purchased the aviation gas fuel tank from Southern Casing and has, thereby, become owner of that tank.[5] The judgment denied the claims asserted by Houma Avionics in its reconventional demand.
Houma Avionics has appealed these judgments. With respect to the judgment on the action for declaratory judgment, we vacate the portion of the judgment that declares that Houma Avionics is the owner of the hangar and the portion that orders Houma Avionics to pay $114,100, with legal interest from August 14, 1998, to Southern Casing. We affirm the provisions of the judgment addressing ownership of the tanks and pumps, and remand the matter for further proceedings to determine ownership of the hangar.
With respect to the judgment on the action for judicial sequestration, we affirm that part of the judgment declaring Southern Casing to be the owner of the two fuel tanks and pumps at the time the action *1044 was instituted. We also affirm that part of the judgment recognizing that Houma Avionics later purchased the aviation gas fuel tank. We vacate that part of the judgment denying Houma Avionics' claim for unjust enrichment but otherwise affirm the denial of Houma Avionics' claims raised in its reconventional demand. We remand this matter for further proceedings to address ownership of the hangar and to reconsider Houma Avionics' claims for unjust enrichment.

I. FACTUAL AND PROCEDURAL BACKGROUND
Houma Avionics, a company owned and operated by James Graves, engages primarily in the installation and repair of radios and other aviation equipment. Until 1992, Houma Avionics had operated its business on its leasehold without the use of an airplane hangar. During May of 1992, Graves learned that Southern Casing was interested in leasing property from the Airport Commission for the purpose of constructing a hangar. Graves also learned that Southern Casing's bid had been rejected by the commission.[6]
Southern Casing was controlled and managed by Michael X. St. Martin. Graves had previously performed avionics repair work on St. Martin's airplanes and he also knew Southern Casing's pilot, Lloyd Geist. At some point, Graves and Geist discussed the possibility of entering into a business agreement whereby an aircraft hangar would be built on Graves' leasehold. According to Graves, he had been contemplating constructing a hangar on his leasehold and he believed that if a larger hangar were built it could accommodate the interests of both Southern Casing and Houma Avionics. Graves understood that Southern Casing wanted private hangar space for the storage of St. Martin's airplanes and the ability to obtain fuel at less than retail cost. Since Houma Avionics was a fixed-based operator (FBO), it was licensed to store and sell aircraft fuel. As of that time, however, Houma Avionics did not have storage tanks on its leasehold and had not been selling fuel.
Geist testified that when he first spoke with Graves, he understood that Graves was proposing that both parties could benefit from a shared arrangement. Southern Casing would not have to pay rent to the airport commission if it built on the property leased by Graves and Graves would have a hangar in which he could conduct business out of the weather. Geist testified that he was not initially interested in the proposal because he understood St. Martin was interested in operating his own facility. Geist explained, however, that Graves continued to pursue the deal. According to Geist, Graves ultimately proposed he would pay all utilities and insurance expense, obtain all building permits, sell fuel to Southern Casing at cost, and pay a fuel flowage fee to Southern Casing on each gallon of fuel sold to third parties. In exchange, he expected Southern Casing to incur the expense of building the hangar and installing the fuel facilities.
Graves and Geist were the primary persons involved in discussing the terms of the business arrangement. But at some point prior to or during the construction of the hangar, St. Martin, Geist, Graves, and St. Martin's accounting personnel met to discuss the terms of the agreement. St. Martin testified that Graves wanted Southern Casing to transfer ownership of the hangar and tanks to him at a later date for *1045 no additional consideration. St. Martin testified that the meeting ended without an agreement regarding ownership and that no documents were executed regarding the terms of an agreement. Despite the parties' failure to reach an agreement regarding ownership, the construction of the hangar and installation of the tanks was not halted. Apparently, since both Southern Casing and Graves stood to benefit from the arrangement regardless of who owned the improvements, neither party sought to end the proposed business arrangement. St. Martin instructed Geist to continue to negotiate with Graves.
Construction of the improvements began in either May or June of 1992, and was complete by October of 1992. The parties stipulated at trial that Southern Casing spent a total of $162,945 in construction expenses, consisting of $75,577 to construct the hangar, $36,250 to construct the aviation gas tanks, pumps and foundation, and $51,118 to construct the jet fuel tank, pumps and foundation.
While construction was ongoing, Geist and Graves continued to discuss the arrangement. Graves apparently told Geist that he wanted to have an agreement reduced to writing but did not have an attorney. Geist related this information and the general agreement that Graves was proposing to Richard Mire, an attorney who worked in St. Martin's law firm. During July of 1992, Mire contacted Milton Cancienne, another attorney, and requested that Cancienne draft the documents with the terms proposed by Graves. Mire understood that Graves wanted to save money by not hiring his own attorney and that Graves was requesting that a document be prepared and presented to St. Martin so that it could be determined whether he would agree to the terms proposed by Graves. Mire gathered information regarding the general provisions of the proposed arrangement from conversations with Graves and obtained more specific details of Graves' proposal from Geist.
Based on this information, Cancienne initially drafted several documents in August of 1992. These documents included a letter of agreement addressing airplane hangar use, a promissory note and a mortgage and security agreement. The letter of agreement, as originally drafted, provided that Houma Avionics was the owner of the hangar and that Southern Casing had the right to use one-third of the hangar for a payment to Houma Avionics of $1,113.80 per month for a period of 60 months. The terms of the promissory note to be executed by Houma Avionics provided that Houma Avionics would pay to Southern Casing a monthly installment of $1,113.80 for 60 months with no interest, representing a total sum of $66,828. The draft of the mortgage and security agreement provided that Houma Avionics conveyed a security interest in the hangar and other improvements located on the leased property to secure payments due on the note.
After construction of the hangar was complete, Mire informed Cancienne that the cost of the hangar was higher than expected and the terms of the documents needed to be adjusted. Cancienne redrafted the documents to provide for monthly payments of $1,500 and a total debt of $90,000 on the promissory note. He made corresponding changes to the mortgage and security agreement. The letter of agreement was also revised to provide that Southern Casing would have the right to use one-half of the hangar to house its airplanes and equipment.[7] The revised documents were dated December 1, 1992.
*1046 At trial, Cancienne testified that none of the parties ever returned to him a completely executed letter of agreement or an executed set of the mortgage and note documents. His files contained unsigned documents but he did not know why they had never been executed. Cancienne received payment for his services from St. Martin's law firm.
Mire explained that once Cancienne prepared a draft, it was sent to Beyer for review from a business standpoint and then discussed with St. Martin. Mire testified that the documents were prepared with the goal of transferring ownership to Graves but that the goal was never reached.
Before Cancienne prepared the second set of documents, Geist apparently delivered the initial set of documents to Graves. On August 8, 1992, Graves executed the first draft letter of agreement. He did not execute any of the other documents. Although he testified that he understood that Geist was going to take the documents back to St. Martin for execution, he also acknowledged at trial that Geist "was always telling me everything had to be approved by Mike St. Martin." He did not recall Geist returning with any other paperwork. Graves testified that he was not interested in entering any arrangement with Southern Casing that did not provide that he would become the owner of the hangar. Based on the discussions with Geist and his execution of the first-draft letter of agreement, Graves believed that he was to be the owner of the hangar at the end of the sixty-month time period addressed in the letter of agreement. Graves testified that Geist never informed him that St. Martin had rejected the agreement.
St. Martin testified that a number of documents were proposed addressing the sale of the hangar and other improvements but that none of the documents were ever executed on behalf of Southern Casing. St. Martin stated that his accountant, Roy Beyer, analyzed the deal that was set forth in the documents prepared by Cancienne, and advised against it. The reason Beyer did not support the proposal was because St. Martin would have been, in effect, paying for his own assets twice. When Beyer disapproved of the deal, St. Martin was not interested in pursuing it any further. St. Martin testified that as the arrangement stood, Graves' consideration for the hangar and fuel facilities being placed on his leasehold was solely that he had the right to use the improvements. St. Martin understood that he would own the hangar and fuel facilities and Graves would handle the fuel sales.
Although Houma Avionics executed the letter of agreement, it never executed the security agreement or promissory note. Southern Casing never executed any of the documents drafted by Cancienne. Despite the parties' failure to execute these documents, they shared the occupancy of the hangar from October of 1992 until August of 1998. During this period of time, Houma Avionics never made any payments based on the terms of the promissory note. Likewise, Southern Casing never paid any lease payments for use of the hangar space. When the 60-month time period referred to in the letter of agreement expired, Graves demanded that Southern Casing should either begin paying rent or vacate the premises. Southern Casing responded by removing its aircraft and equipment from the hangar in August of 1998. Sometime later, Houma Avionics purchased the aviation gas tank and pump from Southern Casing for $20,000, reserving its rights to litigate ownership of the tank, and Southern Casing removed the jet fuel tank from the leased premises.
During the period that the parties shared the hangar and tanks, Southern *1047 Casing purchased approximately 110,000 gallons of fuel from Houma Avionics at a "cost" price. St. Martin acknowledged this price was about one-half of the average retail price. For each gallon of jet fuel and aviation gas that was sold to third parties from the tanks, Houma Avionics paid fuel flowage fees to Southern Casing.[8] During the years that the parties shared occupancy of the hangar, these payments totaled $36,390. Graves also testified that while the parties had co-occupied the hangar, he had incurred the expenses of taxes, insurance, utilities, and the lease expense, which was a little over $400 per month.

II. TRIAL COURT'S DISPOSITION
The trial court conducted the trial of the matter in two phases, conducting separate hearings to address the respective liabilities of the parties and the quantum of damages. At the conclusion of the first hearing, the trial court addressed the property classifications of the hangar and the fuel tanks and pumps. The court determined that the hangar was a separate immovable, since it was owned by someone other than the owner of the ground, citing La. C.C. art. 464 and 465.[9] The court classified the fuel tanks and pumps as movables under La. C.C. art. 471. With respect to the agreement between the parties, the court determined that the conduct of the parties evidenced the terms of the contract. The court found that St. Martin's testimony describing the agreement between the parties was credible and that the conduct of the parties was consistent with his testimony.
The court determined that in consideration for allowing Southern Casing to have access to the leased property, Houma Avionics obtained the use of the hangar and tanks and gained the ability to sell fuel to third parties. The court found that Houma Avionics also agreed to allow Southern Casing to use a portion of the hangar, obtain fuel at cost from Houma Avionics, and receive fuel flowage fees. The court determined this agreement was supported by lawful cause and was not based on fraud.
The court acknowledged that although the agreement between the parties was incomplete, Houma Avionics had failed to prove the existence of an agreement that conveyed ownership of the improvements to it. The court concluded that the letter of agreement, which Houma Avionics urged represented the agreement of the parties, had no effect because it had not been executed by Southern Casing. The court noted that even the letter of agreement, which had been signed by Graves, did not reflect the agreement that Graves contended was in existence between the parties. The court found the agreement did not address the sale of fuel to Southern Casing, the payment of fuel flowage fees, or the payment of insurance.
Addressing the ownership of the hangar, the court concluded that the Louisiana Civil Code does not contain provisions squarely addressing a situation where a lessee permits another to place a building on the land of another. The court reasoned that it should be guided by principles of equity, citing La. C.C. art. 4. Finding that Houma Avionics, as lessee, was in a position analogous to an owner and that Southern Casing was in the position of a good faith precarious possessor, the trial court determined it was appropriate to apply La. C.C. art. 496, which addresses constructions by a possessor in good faith. Reasoning that because Southern Casing had the consent of Houma Avionics to *1048 place the improvements on the leasehold, the court determined that Houma Avionics could not demand that the improvements be demolished or removed but must keep them and pay for them. The trial court determined that Houma Avionics had the option to pay to the possessor either the cost of the materials and of the workmanship, their current value, or the enhanced value of the immovable improvements.
With respect to the movable tanks and pumps, the trial court determined that Southern Casing was the owner at the time that the proceedings were instituted. There was no agreement that addressed ownership of these improvements and the record established that Southern Casing had paid for them. The court recognized that Houma Avionics had later purchased the aviation gas tank and pump and was, therefore, entitled to keep it.[10]
Several months later, the trial court conducted a hearing on the issue of quantum. At the beginning of the hearing, the trial court requested that Houma Avionics make a selection between the three payment options addressed by article 496. Without conceding that the court was correct in ordering Houma Avionics to elect an option, Houma Avionics selected the option of paying Southern Casing the current value of the hangar. During the hearing, evidence was introduced to establish the current value of the hangar with each party offering a valuation by an expert appraiser.
The trial court accepted the $114,000 valuation provided by Southern Casing's expert.[11] In accord with that finding, the trial court's judgment on the declaratory action recognizes Houma Avionics as owner of the hangar but orders it to pay $114,000 to Southern Casing, together with legal interest from August 14, 1998, the date upon which Southern Casing filed its original petition for judicial sequestration. The judgment further declared that Houma Avionics was not the owner of the two fuel tanks and pumps when the action was instituted. The judgment on the action for judicial sequestration declares Southern Casing was the owner of the two fuel tanks and pumps when the action was instituted and denies Houma Avionics reconventional demands based on breach of contract, fraud and unjust enrichment.

III. ASSIGNMENTS OF ERROR
Houma Avionics urges that the trial court erred by: 1) relying on the testimony of St. Martin; 2) failing to find that Geist had the authority to bind Southern Casing to a contract; 3) applying La. C.C. art. 496 as the basis for ordering Houma Avionics to compensate Southern Casing for the improvements placed on Houma Avionics' leasehold interest; 4) requiring Houma Avionics to elect a measure of compensation pursuant to La. C.C. art. 496 before the values addressed in that article (the cost of materials and workmanship, their current value, and the enhanced value of the immovable) were established; 5) excluding an expert witness from testifying on the grounds that no written report was attached to the pre-trial order, when the witness had been identified in the pretrial order and no report had been rendered at the time the pre-trial order was filed; 6) ordering interest on the judgment from August 14, 1998; 7) failing to award damages to Houma Avionics for the wrongful issuance of the order of sequestration; and 8) denying Houma Avionics' motion for new trial on the grounds that *1049 the presiding judge, Judge Charles Hanemann, should have been recused.

IV. ANALYSIS

A. Motion for New Trial/Recusal
Houma Avionics asserts that its motion for new trial should have been granted on the grounds that Judge Charles Hanemann should have been recused during the proceedings below. Prior to trial on the merits, Houma Avionics filed a motion to recuse Judge Hanemann. Therein, Houma Avionics maintained that when St. Martin was deposed, Houma Avionics discovered that St. Martin "controlled" Southern Casing and was a prominent figure in the Houma-Terrebonne Parish area where the trial was held. The motion stated that upon Houma Avionics' further inquiry, Judge Hanemann revealed that he had numerous dealings with St. Martin during the past 32 years.
On June 17, 1999, a hearing was held before Judge Timothy C. Ellender, another judge from the same judicial district court, to determine whether grounds for recusal existed. During the hearing, Judge Hanemann testified that although he and St. Martin had practiced law together in the same firm during the 1960's, they had experienced a very adversarial separation. Sometime between 1994 and 1996, Judge Hanemann represented St. Martin in a dispute with his disability insurance carrier and he also defended St. Martin in another action in federal court. Judge Hanemann acknowledged that St. Martin had also consulted him for advice on another legal matter at some point between 1996 and 1998. During his years of practicing law, he or other members of his firm represented clients who litigated against other parties that were represented by St. Martin or other members of St. Martin's firm. Judge Hanemann stated that he has seen St. Martin at social functions and that he had once accepted a plant as a gift from St. Martin. Despite these contacts with St. Martin, Judge Hanemann testified that he was not biased toward or against the parties or interested in the litigation's outcome.
Judge Ellender denied the motion to recuse Judge Hanemann, giving the following reasons:
We have a small legal community here [in Houma]. Everybody comes in contact with everybody else in either an adversarial or a representative or a fiduciary capacity at some point in our career, and nothing has been shown to me that would in any way indicate that Judge Hanemann would be biased or prejudiced.
Pursuant to its motion for new trial, Houma Avionics urged that Judge Hanemann should have been recused based on the provisions of La. C.C.P. art. 151(B)(5), which provides for a judge's recusal when he "is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings." Based on Judge Hanemann's testimony regarding his contacts with St. Martin, Houma Avionics argued that Judge Hanemann should have been recused in order to avoid any appearance of bias in favor of St. Martin and Southern Casing.
Recusation of a judge involves either a judge removing himself or being removed from a case and being replaced by another judge. Recusal may be voluntary as when a judge takes himself off a case for legally compelling reasons or simply because he believes that he cannot fairly and impartially judge a matter before him. La. C.C.P. art. 152; La.C.Cr.P. art. 672. It may be involuntary as when a litigant files a motion to recuse for stated legal reasons, the judge refuses to recuse himself, and *1050 court proceedings thereafter result in his being recused by another trial judge or by an appellate court. La. C.C.P. art. 151; La.C.Cr.P. art. 671; In re Lemoine, XX-X-XXXX, p. 4 (La.1/14/97), 686 So.2d 837, 839, on rehearing, 692 So.2d 358.
In each possible recusal situation, there is a countervailing consideration that militates in favor of a judge's not recusing himself, or being recused. It is that the judge has an obligation, part of his sworn duty as a judge, to hear and decide cases properly brought before him. He is not at liberty, nor does he have the right, to take himself out of a case and burden another judge with his responsibility without good and legal cause. Id. at 839-840.
Matters relating to judicial disqualification due to kinship, personal bias, and remoteness of interest are generally matters of legislative discretion. The traditional common law rule was that a judge could not be disqualified for bias or prejudice. But the recent trend has been to adopt statutes permitting disqualification on those grounds. Pierce v. Charity Hosp. Of La., 550 So.2d 211, 213 (La.App. 4th Cir.1989), writ denied, 551 So.2d 1341 (La. 1989). Although La.C.Cr.P. art. 671 has included bias and prejudice as a ground for recusation in criminal cases since 1966, La. C.C.P. art. 151 did not include those grounds until 1987. Prior to that time, impartiality, bias, and prejudice were not statutory grounds for recusation in a civil matter. Id. Currently, both La.C.Cr.P. art. 671 and La. C.C.P. art. 151 list as a recusal ground such bias or prejudice that results in an inability to conduct fair and impartial proceedings.
A judge is presumed to be impartial. Couvillion v. Couvillion, 00-143, p. 9 (La.App. 5th Cir.9/26/00), 769 So.2d 747, 753, writ denied, 00-3185 (La.1/12/01), 781 So.2d 562. La. C.C.P. art. 151 enumerates the exclusive grounds for recusal and it does not list a "substantial appearance of the possibility of bias" or even a "mere appearance of impropriety" as causes for removing a judge from presiding in a given action. Article 151 requires a finding of actual bias or prejudice. Edwards v. Daugherty, 97-1542, p. 9 (La. App. 3d Cir.3/10/99), 729 So.2d 1112, 1120, writs denied, 99-1393, 99-1434 (La.9/17/99), 747 So.2d 1105. The bias or prejudice must be of a substantial nature and based on more than conclusory allegations. Couvillion v. Couvillion, 769 So.2d at 753.
Considering the evidence presented at the hearing, we find no abuse of discretion in Judge Ellender's denial of the motion to recuse and thus, no basis for a grant of a new trial; Judge Ellender's denial of the motion to recuse was not contrary to the law and evidence. La. C.C.P. art. 1972. While the record establishes that Judge Hanemann had business relationships in the past with St. Martin, the evidence simply does not establish that Judge Hanemann was biased in favor of St. Martin or Southern Casing. Likewise, there was no evidence that Judge Hanemann was prejudiced against Houma Avionics.
Houma Avionics also contends on appeal that it did not receive an impartial and unbiased hearing on its motion to recuse held before Judge Ellender. Houma Avionics asserts in brief that after the hearing on the motion to recuse was held and Judge Ellender had issued the adverse ruling, it discovered that "Judge Ellender was living in a residence owned by Mr. St. Martin ... and that upon [one] occasion, Mr. St. Martin and Judge Ellender were both at the residence at the same time." Houma Avionics further alleges in brief that "Judge Ellender's son had become an associate with the St. Martin firm within such a short period of time following the hearing as to raise the inference that `Houma *1051 Avionics' did not receive an impartial and unbiased hearing on its Motion to Recuse." The record on appeal does not support any of these contentions. Furthermore, in Houma Avionics' memorandum in support of its motion for new trial, Houma Avionics asserted that it had learned of these "new facts" prior to the November 4, 1999 hearing addressing the issue of damages. Thus, since this information was known to Houma Avionics prior to the final hearing in this matter, it does not support the grant of a new trial based on "newly discovered" evidence. La. C.C.P. art. 1972(2).
Thus, we find no merit in Houma Avionics' contention that a new trial should have been granted on the grounds that its motion to recuse was improperly denied.

B. Claims regarding sale of hangar
Houma Avionics asserts it is owner of the hangar based on the agreement that existed between the parties, as testified to by Graves and as evidenced by the letter of agreement. Houma Avionics also contends the trial court erred in applying La. C.C. art. 496 to support the determination that it should compensate Southern Casing for the hangar that was built on the leased property.
La. C.C. art. 1839 provides, in pertinent part:
A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.
Since the hangar is immovable property, its ownership could not have been transferred in the absence of a written agreement or an oral agreement with a declaration under oath. Since the letter of agreement was only executed by Graves on behalf of Houma Avionics, it was not effective in transferring ownership. Likewise, even an oral agreement between the parties was insufficient to convey ownership of the hangar.[12]
We do, however, agree with Houma Avionics that the trial court erred in its application of La. C.C. art. 496. This article provides:
When constructions, plantings, or works are made by a possessor in good faith, the owner of the immovable may not demand their demolition and removal. He is bound to keep them and at his option to pay to the possessor either the cost of the materials and of the workmanship, or their current value, or the enhanced value of the immovable.
Since Houma Avionics is not the owner of the immovable, the provisions of this article should not be applied by analogy to resolve the dispute between Houma Avionics and Southern Casing. Article 496 imposes a specific obligation that correlates to the specific rights of an owner. The rights of an owner to use, encumber, sell, or otherwise dispose of the improvement is the premise for the correlative obligation to pay for the improvements. Even though a lessee of property has rights that are similar to those of an owner, the lessee's rights are not sufficiently analogous to justify the imposition of the obligations addressed in this article. Houma Avionics does not own the hangar and, as lessee, does not enjoy the full benefits of its ownership. Thus, the obligations of an owner should not be imposed on it.
*1052 But we also disagree with the trial court's application of La. C.C. art. 496 for another significant reason. We cannot equitably resolve Southern Casing's claim of ownership of the hangar and Houma Avionics' claims for unjust enrichment because the Airport Commission has not been made a party to this litigation. To demonstrate why the Airport Commission needs to be joined as a party to adjudicate the issues presented in this case, we address La. C.C. arts. 493 and 497, which state, in part:
Art. 493. Ownership of improvements
Buildings, other constructions permanently attached to the ground, and plantings made on the land of another with his consent belong to him who made them. They belong to the owner of the ground when they are made without his consent.

When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to their former owner. (Underlining added).
Art. 497. Constructions by bad faith possessor
When constructions, plantings, or works are made by a bad faith possessor, the owner of the immovable may keep them or he may demand their demolition and removal at the expense of the possessor, and, in addition, damages for the injury that he may have sustained. If he does not demand demolition and removal, he is bound to pay at his option either the current value of the materials and of the workmanship of the separable improvements that he has kept or the enhanced value of the immovable.
Based on Article 493, the airplane hangar belongs to the Airport Commission, as owner of the ground, unless it was built with the Airport Commission's consent. Although the record establishes that the hangar was constructed with Houma Avionics' consent, the record fails to establish that the hangar was constructed with the consent of the Airport Commission. Since the lease between the Airport Commission and Houma Avionics was not introduced into evidence, the record does not establish that Houma Avionics was authorized under the terms of its lease to construct buildings on the property. As such, the record does not establish that the consent of the lessee is tantamount to the consent of the lessor. Likewise, we cannot infer that the Airport Commission consented to the construction of the hangar from the factual circumstances presented. Consequently, we cannot determine who owns the hangar.
And because we cannot determine who owns the hangar based on this record, we cannot equitably dispose of the claims of the parties who are already before this court. Certainly, if the Airport Commission were deemed owner of the hangar, there would be no equitable grounds to support an order directing Houma Avionics to pay to Southern Casing the current value of the hangar. We also recognize that if the Airport Commission were joined as a party and found to be owner of the hangar because it did not consent to the hangar's construction, the Airport Commission could possibly demand the demolition and removal of the hangar based on the provisions of Article 497, addressing constructions made by a bad faith possessor.
We find no merit in Southern Casing's claim that it is a possessor in good *1053 faith. To be a possessor in good faith within the meaning of La. C.C. art. 496, Southern Casing would have had to build the hangar while possessing the leased property by virtue of an act translative of ownership, believing itself to be owner of the leased property. La. C.C. art. 487; See Venta v. Ferrara, 195 La. 334, 196 So. 550 (1940). If the Airport Commission were found to be owner of the hangar and elected not to demand demolition and removal, it would be bound to pay to Southern Casing either the current value of the materials and workmanship of the hangar or the enhanced value of the hangar. La. C.C. art. 497.
Louisiana Code of Civil Procedure article 641 provides that a person "shall be joined as a party in the action when ... in his absence complete relief cannot be accorded among those already parties." Thus, we remand this matter for the purpose of having the Airport Commission joined as a party so that a proper determination can be made regarding ownership of the hangar and so that Houma Avionics' claims of unjust enrichment can be reconsidered after this determination is made.[13]
Accordingly, with respect to the trial court's judgment that addresses the action for declaratory judgment, we vacate the part that declares Houma Avionics to be the owner of the hangar, the part that orders Houma Avionics to pay to Southern Casing the sum of $114,000, and the part ordering each party to pay its own court costs. And with respect to the trial court's judgment that addresses the action for judicial sequestration, we vacate the part that denies Houma Avionics' claim for unjust enrichment but otherwise affirm the denial of Houma Avionics' claims raised in its reconventional demand. We also vacate the part of the judgment that orders each party to pay its own court costs. On remand, the trial court should reassess all cost allocations.

C. Claims regarding sale of fuel tanks and pumps
Houma Avionics urges the trial court erred in relying on St. Martin's testimony, which denied the existence of an agreement to transfer ownership of the fuel tanks and pumps, rather than relying on the testimony of Graves, which supported the existence of such an agreement. Houma Avionics contends it was error for the trial court to rely on St. Martin's testimony because his testimony establishes he did not have first-hand knowledge of the negotiations that occurred between Geist and Graves.
Graves testified that according to the agreement he negotiated with Geist, he was to be the owner of the fuel tanks. He explained that the fuel flowage fees were intended to repay Southern Casing for the expense of installing the tanks. Contradicting Graves' testimony, Geist testified that he and Graves had no discussions regarding Graves' purchase of the tanks. Based on his discussions with Graves, Geist believed that the money paid by Graves to Southern Casing was a payment of rent rather than a payment for the reimbursement of the purchase price of the tanks. While acknowledging that Geist discussed the terms of the arrangement with Graves, St. Martin denied that there was an agreement that the fuel flowage fees were to be applied towards Graves' purchase of the fuel tanks. He also stated there was never an agreement that Graves was to obtain ownership of the tanks simply because Southern Casing had the benefit of buying fuel at cost.
*1054 Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993).
Faced with contradictory testimony, the trial court concluded that there was no agreement establishing a sale of the fuel tanks and pumps to Houma Avionics prior to the commencement of this litigation. Although the trial court reached the conclusion that St. Martin was a credible witness, the trial court did not suggest that his conclusion was solely based on the testimony of St. Martin. Geist's testimony also supported the trial court's conclusion. Thus, even if we were to determine that St. Martin's testimony was not determinative of this issue, the record still supports the trial court's conclusion. We find no manifest error in the trial court's determination that no oral agreement was reached between the parties conveying ownership of the fuel tanks and pumps.
Houma Avionics also urges that the trial court erred in failing to address the actual or apparent authority of Geist to bind Southern Casing to a contract with Houma Avionics. But in concluding there was no agreement between Southern Casing and Houma Avionics regarding the sale of the tanks and pumps, the trial court implicitly found there was no agreement between Geist and Graves. The trial court apparently accepted Geist's testimony that he and Graves had no discussions regarding Houma Avionics' purchase of the tanks and pumps. Thus, even if Geist did have the authority to bind Southern Casing, we find no error in the trial court's conclusion that he did not enter into any agreement with Graves regarding a sale of the tanks and pumps and thus, did not bind Southern Casing to such an agreement.
Accordingly, we find no error in the trial court's determination that Southern Casing was the owner of the tanks and pumps at the time that these consolidated suits were filed. With respect to the judgment on the action for judicial sequestration we affirm that part of the judgment declaring Southern Casing to be the owner of the two fuel tanks and pumps at the time the action was instituted. We also affirm that part of the judgment recognizing that Houma Avionics later purchased the aviation gas fuel tank. With respect to the petition for declaratory judgment, we likewise affirm the provisions of the judgment addressing ownership of the tanks and pumps.[14]

D. Exclusion of Expert Witness
Houma Avionics challenges the trial court's exclusion of the testimony of Charles Theriot, a certified public accountant. Houma Avionics attempted to introduce Theriot's testimony and a report that he prepared to support their claim for unjust enrichment. At trial, Southern *1055 Casing's counsel objected to the introduction of the report and the expert's testimony, stating that she had received the report only two days before trial and that she was not able to respond to it efficiently due to the late offering. Counsel also stated that she had presumed that Mr. Theriot would not testify because no copy of Theriot's report had been attached to the pretrial order, as the court had required.
Prior to trial, the judge sent a pretrial order to counsel that was in the form of a letter, dated April 14, 1999. This letter informed counsel of the July 8, 1999 date of trial, established applicable cut-off dates for discovery and amendment of the pleadings, and directed counsel that a joint pretrial statement was to be delivered to him two weeks before the scheduled trial date. The judge also directed that the "[r]eports of all experts must be attached to the joint pre-trial statement." Based on this language, the trial court excluded Theriot's expert testimony and his report, stating that the court had not received Theriot's report until the day before trial. Houma Avionics asserts that while the court's exclusion of the report may have been proper, the trial court abused its discretion in excluding Theriot's testimony.
Louisiana Code of Civil Procedure article 1551 allows the trial court to render orders that control the subsequent course of the trial unless modified at the trial to prevent manifest injustice. The law provides that an orderly disposition of each case and the avoidance of surprise are inherent in the theory of pre-trial procedure and are sufficient reasons for allowing the trial judge to require adherence to the pre-trial order in the conduct of an action. Although the trial court is vested with much discretion to amend its pre-trial order, this discretion must be exercised to prevent substantial injustice to the parties who have relied on the pre-trial rulings and structured the preparation and presentation of their cases accordingly. Only upon a showing of an abuse of that discretion should the appellate court intervene. See Grayson v. R.B. Ammon and Associates, Inc., 99-2597, p. 9 (La.App. 1st Cir.11/3/00), 778 So.2d 1,10, writs denied, 00-3270, 00-3311 (La.1/26/01), 782 So.2d 1026, 782 So.2d 1027; Highlands Underwriters Ins. Co. v. Foley, 96-1018, p. 5 (La.App. 1st Cir.3/27/97), 691 So.2d 1336, 1340. Additionally, the trial court's discretion in controlling the admission of expert testimony is well established in Louisiana jurisprudence, La. C.E. art. 702; Fowler v. Bauman, 95-0145, p. 5 (La.App. 4th Cir.10/12/95), 663 So.2d 438, 441.
We do not find that the trial court abused its discretion in excluding Theriot's testimony. The trial court had instructed counsel that the reports of expert witnesses were to be attached to the joint pre-trial statement. That statement was to be provided to the court no later than two weeks before trial. Counsel for Houma Avionics urges that the letter did not specify that a report had to be provided to the court for each expert. Yet he offers no valid justification for his failure to provide the report to opposing counsel and to the court within a reasonable period of time prior to trial. Regardless of how the trial court's order might have been interpreted by Houma Avionics' counsel, it was unreasonable for him to expect that his expert should have been allowed to testify. The expert proposed to address information contained within a report that was not made available to opposing counsel until two days prior to trial. Houma Avionics' counsel provided no compelling reasons for the delay in making the report available. Since Southern Casing had prepared for trial without the availability of this expert's report, we find no error in the trial court's exclusion of Theriot's testimony.
*1056 The same considerations do not, however, apply in the hearing to be considered on remand. There can be no surprise. Accordingly, Theriot's testimony may be relevant and should be allowed if otherwise admissible.

V. CONCLUSION
For the reasons stated above, we remand this matter for further proceedings. After the Airport Commission is joined as a party, the trial court is instructed to make a determination regarding ownership of the hangar and to reconsider Southern Casing's unjust enrichment claims. With respect to the judgment on the action for declaratory judgment, we vacate that portion of the judgment that declares that Houma Avionics is the owner of the hangar and orders it to pay $114,100, with legal interest from August 14, 1998, to Southern Casing. We affirm the provisions of the judgment addressing ownership of the tanks and pumps. We also vacate that part that ordered each party to pay its own costs of court but we affirm that part of the judgment that fixes the experts' fees.
With respect to the judgment on the action for judicial sequestration, we affirm that part of the judgment declaring Southern Casing to be the owner of the two fuel tanks and pumps at the time the action was instituted. We also affirm that part of the judgment recognizing that Houma Avionics later purchased the aviation gas fuel tank. We vacate that part of the judgment denying Houma Avionics' claim for unjust enrichment but otherwise affirm the denial of Houma Avionics' claims raised in its reconventional demand. We also vacate that part of the judgment ordering each party to pay its own court costs.
AFFIRMED IN PART, VACATED IN PART AND REMANDED.
NOTES
[1] The Honorable Philip C. Ciaccio, Judge (retired), Fourth Circuit Court of Appeal, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The trial court initially ordered the Sheriff of the Parish of Terrebonne to remove and sequester the tanks and to sequester the airplane hangar at its present location until ownership could be adjudicated. The order provided that Houma Avionics had the right to use the hangar to operate its business while the matter was pending.
[3] The judgment references not only the hangar but also the concrete slab on which the hangar is built, a concrete ramp at the approach to the hangar, the concrete foundations for two fuel tanks formerly located adjacent to the hangar, and a concrete containment wall surrounding the former location of the fuel tanks. For brevity, we refer solely to the hangar throughout this opinion but our reference to the hangar includes these other improvements.
[4] Prior to the trial, Houma Avionics purchased the aviation gas tank and its plumbing and pumping system from Southern Casing for $20,000. In the sales agreement, the parties acknowledged that the actual ownership of these items was the subject of litigation and that if Houma Avionics prevailed in its ownership claim, the trial court would determine the manner in which Houma Avionics would receive credit for this purchase.
[5] We note that the judgment on the action for judicial sequestration does not address ownership of the hangar. The judgment was also silent in respect to Southern Casing's claim for damages. But in oral reasons for judgment, the trial court addressed these claims and found they had no merit.
[6] The record establishes that Southern Casing was also doing business as Crescent Air Service. Although some of the testimony and evidence refers to Crescent Air Service rather than Southern Casing, we refer to the company as Southern Casing throughout this opinion.
[7] Geist testified that as the hangar design and the size of the hangar was modified, the party's demands regarding hangar space changed. He recalled that after the hangar was built, the parties agreed that each would be entitled to use one-half of the space.
[8] Southern Casing paid for the fuel the first time that the tanks were filled. Thereafter, Graves paid to have the tanks filled.
[9] The parties stipulated that the hangar was an immovable.
[10] The court did not sign a written judgment addressing the merits of the case until after it held the hearing on quantum.
[11] This valuation included the foundation of the hangar, the hangar building, the ramp to the hangar and the concrete foundations and walls of the fuel containment area.
[12] We find no merit in Houma Avionics' claims that the court erred in failing to address whether Geist had the authority to bind Southern Casing. Even if Geist had the authority to bind Southern Casing, there was no written agreement conveying title to Houma Avionics.
[13] Our analysis of the claims regarding the sale of the hangar pretermits Houma Avionics' assignment of error that the court erred by requiring it to make an election between the payment options addressed in La. C.C. art. 496 before these values were established.
[14] Since Houma Avionics has not established that it was owner of the hangar or the fuel tanks and pumps at the time this litigation commenced, we find no merit in its assertion that it was damaged by the alleged wrongful issuance of the sequestration order. Additionally, since we vacate that portion of the judgment ordering Houma Avionics to pay Southern Casing for the value of the hangar plus interest, we pretermit Houma Avionics' assignment of error that the trial court erred in awarding interest on the judgment from the date that Southern Casing filed its petition for judicial sequestration.