# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 06-1307


LAURA LEONARD LEBLANC

VERSUS

MITCHEL BRETT LEBLANC


**********


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 982178
HONORABLE JULES DAVID EDWARDS, III, DISTRICT JUDGE


**********


ULYSSES GENE THIBODEAUX
CHIEF JUDGE


**********


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and Michael G. Sullivan, Judges.


**AFFIRMED AS AMENDED.**

David Sterling Fitzgerald, Jr.
Cox Fitzgerald, L.L.C.
113 West Convent Street
Lafayette, LA 70501
Telephone: (337) 233-9743
COUNSEL FOR:
    Defendant/Appellee - Mitchel Brett LeBlanc


Samuel David Abraham
P. O. Drawer 2309
Lafayette, LA 70502-2309
Telephone: (337) 234-4523
COUNSEL FOR:
    Plaintiff/Appellant - Laura Leonard LeBlanc

**Eric Scott Neumann**
**P. O. Box 2220**
**Lafayette, LA 70502-2220**
**Telephone:  (337) 237-1113**
**COUNSEL FOR:**
**Plaintiff/Appellant - Laura Leonard LeBlanc**

**Julie Koren Vaughn Felder**
**P. O. Box 80399**
**Lafayette, LA 70598**
**Telephone:  (337) 856-3444**
**COUNSEL FOR:**
**Defendant/Appellee - Mitchel Brett LeBlanc**

**THIBODEAUX, Chief Judge.**

This case involves a custody dispute between the plaintiff-appellant, Laura Leonard LeBlanc ("Laura"), and the defendant-appellee, Mitchel Brett LeBlanc ("Mitch"), over the parties' minor child, Ryan, who will be fourteen years old in July 2007. The parties entered into a Consent Judgment on January 19, 2005, wherein Laura was to have domiciliary custody of Ryan, and Mitch was to have visitation with Ryan for approximately one half of the summer weeks and for at least 25% of the school year. After a trial in March of 2006, Laura was found in contempt of court for failing to enforce the visitation between Ryan and his father. Mitch was found in contempt of court for violating an interim order that required him to attend anger management and parenting classes. Both Laura and Mitch were awarded joint custody with Laura being designated as the domiciliary parent. Mitch was awarded attorney fees. Both parties have appealed the March 2006 judgment. For the following reasons, we affirm and modify the judgment of the trial court.

I.

**ISSUES**

With regard to the appeal of Laura LeBlanc, we must decide:

(1) whether the trial court erred in finding Laura in contempt for violating the January 19, 2005 Consent Judgment, and whether the sanctions imposed were beyond the scope of the court's power pursuant to La.R.S. 13:4611(d)(e);

(2) whether the trial court erred in excluding transcripts from the Motion for Summary Judgment and in not recognizing the January 19, 2005 Consent Judgment as a "considered decree";

(3) whether the trial court erred in establishing joint custody in violation of La.R.S. 9:335(2)(a);

(4) whether the trial court erred in setting the date for the custody trial; and,

(5)    whether the trial court erred in ordering Laura to pay for two-thirds of the cost of counseling for the minor child.

With regard to the appeal of Mitch LeBlanc, we must decide:

(1)    whether the trial court abused its discretion in designating Laura as domiciliary parent;

(2)    whether the trial court erred in finding Mitch in contempt of court for failing to attend the assigned classes; and,

(3)    whether the trial court erred in not awarding Mitch the full amount of the attorney fees for Laura's contempt.

II.

**FACTS AND PROCEDURAL HISTORY**

Laura and Mitch were married in 1992. Their minor child, Ryan, was born on July 1, 1993. The parties subsequently separated and divorced. In 1999, a judgment granting joint custody with a seven-and-seven visitation schedule (seven days with Laura, then seven days with Mitch, and so on) was implemented. In 2003, two court-appointed psychologists evaluated the parties and the minor child and, finding both parents capable and caring, submitted a joint recommendation that the joint custody with seven-and-seven visitation continue. In 2004, Laura filed a rule to modify custody and visitation, and hearings began wherein Laura presented testimony by various witnesses including Ryan's Catholic school counselor since the first grade. Following this testimony, a temporary order was issued in September 2004 which awarded Mitch domiciliary custody of Ryan for the fall semester of 2004, pending the resolution of the trial scheduled to resume in January 2005.

On January 19, 2005, without the presentation of evidence by Mitch, Laura and Mitch entered into a Consent Judgment. Both agreed that Laura would be

2

the domiciliary parent and Mitch would have visitation with Ryan at Mitch's home for at least 25% of the school year, and each summer, for two weeks in June, two weeks in July, and for ten days in August, of each year. In April of 2005, Mitch filed a rule for contempt against Laura because he had not had visitation with his son since January of 2005. Laura asserted that a counselor whom Laura had contacted, Barbara Walley, found suicidal as well as homicidal tendencies in Ryan against his father. Laura filed for a restraining order around the end of May 2005 to prevent visitation between Mitch and Ryan. However, Mitch worked with Walley and Ryan for several months in attempts to work through the problems alleged by Ryan regarding his relationship with his father. In late August 2005, the trial court appointed Dr. Kenneth Bouillion to evaluate Ryan to determine whether he did in fact have suicidal and homicidal tendencies. Dr. Bouillion did not agree with Ms. Walley, and Dr. Bouillion was appointed to begin a reunification process between father and son.

After meeting with Mitch and Ryan on numerous occasions and working through various problems, Dr. Bouillion recommended unsupervised visitation between father and son in December 2005. Apparently there were additional gaps in visitation between Christmas 2005 and the custody trial in March 2006. The trial court issued a judgment awarding joint custody to both parents and issued a Joint Custody Implementation Plan. Domiciliary custody was to remain with Laura, but the seven-and-seven visitation was to resume with specific provisions for counseling and specific provisions for holiday visitation. The judgment also found Laura in contempt for violating the January 19, 2005 Consent Judgment with regard to the minimum visitation between father and son, and it found Mitch in contempt for failing to attend required parenting classes. It is from this judgment that the parties appeal.

3

III.

## LAW AND DISCUSSION

### Standard of Review

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). This is especially applicable in a child custody dispute wherein appellate courts accord substantial deference to the trial judge's conclusions. "The trial judge is in a better position to evaluate the best interest of a child from his observance of the parties and the witnesses and his decision will not be disturbed on review absent a clear showing of abuse." *Deason v. Deason,* 99-1811, p. 12 (La.App. 3 Cir. 4/5/00), 759 So.2d 219, 220 (quoting *State in the Interest of Sylvester*, 525 So.2d 604, 608 (La.App. 3 Cir. 1988)) (citing *Bagents v. Bagents*, 419 So.2d 460 (La.1982)).

Every child custody case must be viewed within its own peculiar set of facts, and a trial court's award of custody is entitled to great weight and will not be overturned on appeal unless an abuse of discretion is clearly shown. *Connelly v. Connelly,* 94-0527 (La.App. 1 Cir. 10/7/94), 644 So.2d 789. Both the Louisiana Legislature and the Louisiana Supreme Court have made it abundantly clear that the primary consideration and prevailing inquiry is whether the custody arrangement is in the best interest of the child. *See Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731.

### Contempt of Laura LeBlanc

Laura contends that the trial court erred in finding her in contempt for violating the January 19, 2005 Consent Judgment and erred in the sanctions imposed. The sanctions included ordering her to pay all court costs from January 19, 2005, to

4

the date the judgment was signed, to pay a fine of $500.00, to pay $13,137.00 in attorney fees to Mitch LeBlanc, and to spend seven days in jail *or* provide weekly reports to Mitch documenting her efforts to improve the relationship between the minor child, Ryan, and his father, Mitch. Mitch responds that the trial court did not err in finding Laura in contempt because she violated the January 19, 2005 Consent Judgment by failing to enforce the minimum visitation requirement therein, and further responds that the court did not err in conditioning the seven day jail sentence on whether Laura documented positive steps to improve the relationship between Ryan and his father.

Pursuant to our Code of Civil procedure, constructive contempt is "[w]ilful disobedience of any lawful judgment, order, mandate, writ, or process of the court." La.Code Civ.P. art. 224(2). "[A] finding that a person wilfully [sic] disobeyed a court order in violation of La.Code of Civil Proc. art. 224(2) must be based on a finding that the accused violated an order of the court 'intentionally, knowingly, and purposefully, without justifiable excuse.'" *Lang v. Asten, Inc.*, 05-1119, p. 1 (La. 1/13/06), 918 So.2d 453, 454 (quoting *Brunet v. Magnolia Quarterboats, Inc.*, 97-187, p. 10 (La.App. 5 Cir. 3/11/98), 711 So.2d 308, 313, *writ denied*, 98-0990 (La. 5/29/98), 720 So.2d 343, *cert. denied sub nom. Polaris Ins. Co., Ltd. v. Brunet*, 525 U.S. 1104, 119 S.Ct. 869). In the present case, the order that Laura is accused of willfully disobeying is the January 19, 2005 Consent Judgment which named her as domiciliary parent of Ryan, subject to summer visitation with Mitch for the first fifteen days of June, the first fifteen days of July, and the first ten days of August, of each year. The Consent Judgment further provided that Ryan's visitation with Mitch during the school year would be as follows:

> SCHOOL YEAR: Whenever Ryan desires to go to
> MITCHELL BRETT LEBLANC's home to visit; however,

not less than 25% of the total school year. LAURA LEONARD RITCHEY shall give reasonable notice by telefax to MITCHEL BRETT LEBLANC's telefax number (337) 896-3487 Ryan's desire to visit with his Dad, and MITCHEL BRETT LEBLANC shall telefax back to LAURA LEONARD RITCHIE's telefax number (337) 988-1121 within two (2) hours of receipt of the telefax if he can be available to have Ryan for visitation. Anytime that Ryan's wishes are telefaxed and received by MITCHEL BRETT LEBLANC, this time shall count as part of the 25% total for the school year.

The record reveals that Mitch tried repeatedly to see his son after the January 19, 2005 Consent Judgment was executed. He notified Laura on January 21, 2005, that his fax machine was being repaired and asked her to send faxes to his father-in-law's fax machine, to which she objected. Mitch sent Ryan a certified letter on February 2, 2005; Laura testified that Ryan did not want to see his dad and ripped up the letter. Mitch sent a fax on February 12, 2005, asking for visitation, and Laura replied that Ryan would like to visit the weekend of February 18 through February 20. However, there were disagreements over the fact that Ryan, who was about eleven-and-a-half years old at the time, was reading and approving the faxes, and ultimately, the child became upset and cancelled the visit. Mitch sent faxes seeking visitation on February 21, February 28, March 7, and March 14, 2005.

Following the February 21 request, the child responded that he would let his father know when he would come and said that his father could call him at any time. Mitch testified that he tried to call many times but never got through because of busy signals, fax line signals, or a full answering machine. Mitch attempted to schedule visitation for Ryan to accompany him and his new family on vacation in February, but subsequently withdrew the invitation because Laura would not provide the dates needed. Likewise, Mitch attempted to schedule visitation for the three-day Easter weekend, but that was also unsuccessful. Mitch did not have visitation with

6

Ryan during the spring and summer of 2005 as required in the Consent Judgment. Laura attempted to argue that Mitch had had Ryan for 33% of the school year, which is more than the 25% requirement, because Ryan had lived with Mitch for the fall semester of 2004. However, the Consent Judgment was not executed until January 19, 2005. Therefore, any custodial time that Mitch had in 2004 was irrelevant as to the visitation requirements of the judgment issued in 2005.

At the contempt hearing in March of 2006, Laura admitted that she had answered some but not all of Mitch's faxes regarding visitation. She further indicated that she tried to make Ryan visit his father but that it was out of her control. Laura attributed this to the fact that she had contacted a counselor, Barbara McCarroll-Walley, LPC, LMFT, who reported finding suicidal tendencies in Ryan, as well as homicidal tendencies in Ryan toward his father, and that Walley was of the opinion that forcing Ryan to visit his father would be harmful to Ryan. Laura, therefore, argued that, even if she did fail to enforce the visitation, which she denied, she was justified in her actions. However, Ryan's first visit with Walley was not until March 30, 2005, and Mitch had already been denied visitation since January. It was not until April or May that Walley had discussions with Ryan of suicide and homicide, and Ryan had been with his mother and had not seen his father for months, since January, when this subject came up. Moreover, Laura did not file for a restraining order to stop visitation until May 25, 2005, and the court order which officially suspended Mitch's visitation, until Walley deemed it advisable, was not signed until July 14, 2005. Mitch worked with Walley for several months, but ultimately, was not allowed to have unsupervised visitation with Ryan for over eight months in 2005.

During that time, on August 31, 2005, Judge Phyllis Keaty, who was the presiding judge, appointed Dr. Kenneth Bouillion, a psychologist well known for his

7

work with children, and who had worked with Mitch and Laura several years before, to meet with Ryan to determine whether he was suicidal and whether there was any reason that Ryan should not have visitation with his father. At the contempt hearing before Judge Edwards in March of 2006, Dr. Bouillion testified that Ryan was not suicidal, that he was somewhat manipulative, and that much of his fear of his father had to do with Ryan's procrastination and how his father would react to Ryan's falling grades while in his mother's care in 2005. More specifically, Dr. Bouillion testified that Ryan had spent most of the fall of 2004 at his father's residence, and during that time his father had him on a strict school and homework schedule, which included help from his step-mom using study guides, and which resulted in good academic performance. We note that both Mitch and Laura remarried, and both had new babies at home. Dr. Bouillion testified that while Laura and her new husband helped Ryan with his school work, there was less accountability at Laura's residence.

From September through early December 2005, Dr. Bouillion met often with Mitch and Ryan and worked at reunifying the father and son upon the request of the court. Dr. Bouillion cautioned Mitch about his blunt manner, and reenacted incidents wherein Ryan had reported rough treatment from his dad, who had cuffed Ryan's head while he was studying, and once accidently caused Ryan to poke himself with a pencil. Dr. Bouillion employed a process called "mass practice" wherein he brought the two together repeatedly and counseled them, with the result that the tension and stress levels decreased, and he ultimately recommended unsupervised visits between father and son. Accordingly, there were visits around Christmas 2005, but then another gap in visitation apparently occurred between December 24, 2005 and mid-February 2006, wherein Mitch did not get to have Ryan visit.

We note that the exhibits contain numerous letters from Laura to Mitch showing Laura's great care and interest in Ryan's day-to-day school and health needs. There is no doubt that she is a loving, caring, and capable mom. With regard to the father's home life, Mitch has a nice place in the country, a large two-story house and huge garage heated and cooled for various kinds of recreation, with four-wheelers to ride, Ryan's scooter and bicycle, a swimming pool, pool table, Ryan's own bedroom decorated to reflect Ryan's interest in cars, Ryan's friends in the neighborhood, and two younger half-brothers with whom to play. Mitch testified that he never misses church and that Ryan always goes to church when he is with him. Both parents have repeatedly been found to be good and capable parents.

However, Dr. Bouillion testified that the conflict between the parents was causing most of the problems, angering the father and causing Ryan to side with his mother. When asked whether he felt that Laura had cooperated fully in the reunification process, Dr. Bouillion indicated that there had been difficulty with Laura in scheduling appointments for him to see Ryan and that her stress level was immense with regard to the reunification. Dr. Bouillion further testified on the other hand that he believed that the father is capable of encouraging a positive relationship with the mother.

The March 2006 hearings lasted several days and included twenty-nine hours of testimony. In addition to the live testimony of Dr. Bouillion, Judge Edwards also heard first hand the testimony of Mitch, Mitch's wife, his mother-in-law, his father-in-law, Laura, Laura's husband, Laura's mother, some of Ryan's teachers, and he heard the testimony of Ryan himself. He was able to hear and observe the witnesses in person. Additionally, he had a joint exhibit which contained the testimony of Barbara Walley, and he had the letters and recommendations of the

9

psychologists, Dr. Luke Elliot and Dr. Lowe.  After the closing argument, the trial

court stated as follows:

> I have been able to listen to you during the course of this trial about some very troubled relationships.  I'm very confident that one of the previous Judges that you have dealt with has more than likely told you that for as long as you live you will be the parents of this child.  That is an accident of history and it turns out that this child came to both of you.  I hope I am now convinced that both of you love this child and I'm convinced that both of you want what's best for this child. . . .  Somehow you all will have to change the dynamics of your relationship if you are to achieve what you both want for your son.  What you are now doing is not working. . . .  Somehow or another you will have to figure out a way to work with the other parent in order to achieve what you want.  You will not be able to achieve what you want by yourself.  The other parent will have to be considered. . . .  But you need to know, whatever I say, you can always allow the other parent to be more involved in the child's life than what I require.  You can always let them be more involved.

It is clear from the record that the trial court considered very carefully

the testimony and evidence before him, and we find no abuse of discretion in his

finding that Laura violated the Consent Judgment by not enforcing the minimum

visitation requirement that Mitch was entitled to under that order.

Laura argues that the order of the court did not recite facts constituting

contempt, which is mandatory under *Havener v. Havener*, 29,785 (La.App. 2 Cir.

8/20/97), 700 So.2d 533, and therefore should be reversed.  More specifically,

La.Code Civ.P. art. 225(B) provides: "If the person charged with contempt is found

guilty the court shall render an order reciting the facts constituting the contempt,

adjudging the person charged with contempt guilty thereof, and specifying the

punishment imposed." "The provisions of C.C.P. art. 225(B) are mandatory and must

be strictly construed.  The failure of a trial court to recite facts constituting contempt

mandates a reversal of a judgment of contempt." *Havener*, 700 So.2d at 538

(citations omitted). In the present case, in the judgment being appealed, the trial court stated, "LAURA LEONARD RITCHIE has not required RYAN LEBLANC, to spend 25% of the school year with MITCHEL BRETT LEBLANC. That conduct is in violation of the January 19, 2005 judgment. That conduct is contemptuous of the orders of Division M2 of this court." This language clearly constitutes a recitation of the facts constituting contempt. We find no error.

Laura further contends that the trial court erred in ordering her to pay all court costs incurred from January 19, 2005 to the date that the judgment is signed, pay a fine of $500.00, pay the sum of $13,137.00 in attorney fees to Mitch, and to spend seven days in jail *or* provide weekly documentation to Mitch regarding her efforts to improve the relationship between Ryan and his father. The allowable sanctions for contempt of court are set forth in pertinent part as follows:

**La.R.S. 13:4611. Punishment for contempt of court**

Except as otherwise provided for by law:

(1) The supreme court, the courts of appeal, the district courts, family courts, juvenile courts and the city courts may punish a person adjudged guilty of a contempt of court therein, as follows:

. . . .

(d) For any other contempt of court, including disobeying an order for the payment of child support or spousal support or an order for the right of custody or visitation, by a fine of not more than five hundred dollars, or imprisonment for not more than three months, or both.

(e) In addition to or in lieu of the above penalties, when a parent has violated a visitation order, the court may order any or all of the following:

(i) Require one or both parents to allow additional visitation days to replace those denied the noncustodial parent.

11

(ii) Require one or both parents to attend a parent education course.

(iii) Require one or both parents to attend counseling or mediation.

(iv) Require the parent violating the order to pay all court costs and reasonable attorney fees of the other party.

(f) A pattern of willful and intentional violation of this Section, without good cause, may constitute a material change in circumstances warranting a modification of an existing custody or visitation order.

Based upon the foregoing, all, except for one, of the trial court's sanctions in this case are specifically listed in La.R.S. 13:4611, including the payment of a $500.00 fine and court costs and attorney fees, and the jail sentence. As to the trial court's offering of an alternative to the jail sentence in the form of Laura's submitting documentation to Mitch of her efforts to improve the relationship between father and son, Laura argues that it directs her into a personal servitude to Mitch without time limitations and is an abuse of the court's power and an illegal sentence.

In support of her position, Laura cites *George v. Nero*, 02-1140 (La.App. 3 Cir. 3/5/03), 839 So.2d 1085. There, the mother was found in contempt for failing to allow summer visitation and was ordered to serve ten days in jail, to pay $500.00 to the father to offset his expenses, and she was assessed all court costs. A panel of this court found that the trial court abused its discretion in ordering the mother to pay $500.00 to the father. We stated as follows:

> [A] contempt proceeding is designed for the vindication of the dignity of the court rather than for the benefit of a litigant. *Nungesser v. Nungesser*, 558 So.2d 695, 701 (La.App. 1st Cir.)[*writ denied,* 560 So.2d 30 (La.1990), *abrogated on other grounds, Wascom v. Wascom*, 96-0125 (La. 4/8/97), 691 So.2d 678]. Thus, the court cannot order a fine or penalty to be paid to a litigant because such payment does not vindicate the court. *City of Kenner v. Jan P. Jumonville, Placide Jumonville*, p. 8, 701 So.2d

12

223[*writ denied,* 97-2890 (La. 1/30/98), 709 So.2d 718].
The fine must be made payable to the court itself. *Id.*

*George v. Nero*, 839 So.2d at 1088. Finding that the assessment of a fine to be paid to the father rather than to the court was in error and in violation of the purposes of contempt proceedings, we reversed the trial court in *George v. Nero.* Likewise, we found that the *indefinite* discontinuance of child support payments was unauthorized and illegal in that case.

In the present case, Mitch agrees that the requirement for Laura to document her efforts to improve the relationship between father and son should have a time limitation and suggests that the documentation be provided to the trial court and to Mitch for the next three months. We agree with the time limitation suggested. However, in keeping with *George v. Nero*, we modify the judgment to provide that the condition for the suspension of the seven-day jail sentence as to Laura be that she provide weekly reports to the trial court only, and not to Mitch personally, for the next three months, documenting her efforts to improve the relationship between Ryan and his father. Her failure to provide documentation to the court will result in her serving the jail sentence set forth in the March 2006 Judgment. The finding of contempt against Laura and all other sanctions imposed are affirmed.

Laura further contends that the trial court erred in excluding transcripts of testimony in her motion for partial summary judgment and at the trial on the merits and in not recognizing the January 19, 2005 Consent Judgment as a "considered decree." In order to understand this somewhat convoluted assignment of error, we must backtrack to previous filings. In 2004, Laura filed a rule for a change of custody. At two hearings on the rule, on August 5th and 10th of 2004, Laura put on testimony by Ryan, by Ryan's school counselor, Sister Kathy, by Father Bill Gearheard, by Mitch's former girlfriend, Crystal Cormier, and by Laura's current

13

husband, Jay Ritchie. The matter was to be concluded at a final hearing on January 19, 2005. However, the parties entered instead into a "Consent Judgment" on that date, wherein Ryan would reside with Laura, and Mitch would have visitation with Ryan in his home for approximately 50% of the summer and 25% of the school year. Due to the Consent Judgment, Mitch never put on testimony on his own behalf; nor did the parties themselves testify; nor was there testimony by any of the psychologists who had previously found both parties fit and capable parents.

When Laura did not facilitate the consented-to visitation in the spring semester of 2005, Mitch filed a rule for change of custody on April 27, 2005. On December 22, 2005, Laura filed a motion for partial summary judgment seeking to have the January 19, 2005 Consent Judgment recognized as a "considered decree" in order to raise the burden of proof in Mitch's April 27 request for a change of custody. More specifically, when a trial court has made a considered decree of permanent custody, the party seeking a change of custody bears the heavy burden of proving that a continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. *Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986). However, in cases where the original custody decree is a stipulated judgment, such as when the parties consent to a custodial arrangement, and no evidence of parental fitness is taken, the burden in changing the present custody arrangement requires only that: (1) a change in circumstances affecting the welfare of the child had occurred since the original decree, and (2) the proposed modification is in the best interest of the child. *Aucoin v. Aucoin*, 02-0756 (La.App. 3 Cir. 12/30/02), 834 So.2d 1245.

14

At the hearing before Judge Edwards on the motion for partial summary judgment, Laura introduced into evidence an affidavit summarizing the August 2004 testimony on her behalf, and she presented the minute entries from the testimony, in her efforts to have the Consent Judgment recognized as a "considered decree." However, the actual transcripts of the 2004 testimony were not available. The transcript of the January 19, 2005 hearing resulting in the Consent Judgment was available, and the trial court did accept that into evidence. Judge Keaty had recited in the Consent Judgment that it was based upon the pleadings and the written stipulations of the parties. Therefore, she did not rely on any testimony regarding fitness of the parties. In fact, as Mitch points out, he did not put on any testimony of his own. Accordingly, Judge Edwards determined that there was not enough evidence before him to render the January 19, 2005 Consent Judgment a "considered decree," and he denied Laura's motion for summary judgment on that issue.

In support of her argument that the Consent Judgment was a considered decree, Laura LeBlanc cites *Adams v. Adams*, 39,424 (La.App 2 Cir. 4/06/05), 899 So.2d 726; *Long v. Long*, 28,763 (La.App. 2 Cir. 12/11/96), 684 So.2d 1099, *writ denied,* 97-096 (La. 3/7/97), 690 So.2d 20; and *Cherry v. Cherry*, 04-0002 (La.App. 4 Cir. 2/2/05), 894 So.2d 1208. However, in *Adams* and *Long*, the parties stipulated to the standard of proof in *Bergeron*; and in *Cherry*, the trial court awarded custody based upon clear and convincing evidence after considering all pertinent facts and circumstances. In the present case, the Consent Judgment was based only upon the pleadings filed and the written stipulations of the parties. Accordingly, the trial court herein did not err in concluding that the January 19, 2005 Consent Judgment was not a considered decree. As to Laura's argument that it was error to not admit the 2004 transcripts, we disagree.

15

At the trial on the merits on March 3, 2006, Laura attempted to introduce the actual transcripts from the August 2004 testimony that she had summarized in an affidavit for the March 1, 2006 hearing on her December 2005 motion for partial summary judgment, which she had filed again in January 2006. Counsel for Mitch objected, stating that the matter of the considered decree had already been decided. The trial court sustained the objection but allowed Laura to proffer the transcripts of the August 2004 testimony. With regard to the excluded transcripts, counsel for Mitch asked whether the transcript evidence pertained to the motions for summary judgment or to "all of the trial." The court responded, "I understood him to be offering evidence that he wanted me to consider when deciding the motion for summary judgment." Counsel for Laura responded, "The motion for partial summary judgment, that's correct."

A trial court is afforded great discretion in the admission of evidence during a trial. Its decision to admit or deny evidence will not be reversed on appeal in the absence of an abuse of that discretion. *McIntosh v. McElveen*, 04-1041 (La.App. 3 Cir. 2/2/05), 893 So.2d 986, *writ denied,* 05-0528 (La. 4/29/05), 901 So.2d 1069. In the present case, the transcripts were offered in support of a motion for partial summary judgment on the issue of whether a consent judgment was a considered decree. Where the transcripts included testimony on behalf of Laura only, and where no evidence was entered on behalf of Mitch regarding fitness of the parties, nothing in the transcripts could change the fact that the Consent Judgment was not a considered decree. A considered decree is rendered by a court only after considering all evidence regarding the fitness of both parties. The Consent Judgment itself recited that it was based upon only the pleadings and the stipulations of the parties.

16

Moreover, just a few days before, at the March 1, 2006 hearing on the motion, while introducing Laura's affidavit summarizing the August 2004 testimony, counsel for Laura stated to the trial judge, "I did not believe that we would have time to give the entire record of all testimony that was taken. I did not believe that to be necessary. . . . I don't think there is a requirement for you to read through three volumes of trial testimony to make that determination." Accordingly, the trial court did not abuse its vast discretion in excluding the transcript evidence a couple of days later on March 3 when counsel for Laura had the actual transcripts of the August 2004 testimony and sought to have them entered for the same purpose.

Laura further contends that the trial court erred in establishing a joint custody and implementation plan that imposes a seven-and-seven custody arrangement (each parent has seven days of alternating weekly custody), provides for Mitch to have custody for the entire school year of 2006-2007, and which denies the mother Christmas visitation. As a threshold matter, the custody plan implemented by Judge Edwards after the March 2006 trial does not deny the mother Christmas visitation. The plan calls for the father to have custody in odd-numbered years from the *beginning* of Christmas holidays, when school lets out, until 2:00 p.m. on December 25th. The plan further provides that the father will have custody in even-numbered years from 2:00 p.m. on December 25th until Christmas holidays *end*, when the child returns to school in the new year.

While the mother is not specifically mentioned, it is clear to this court that the mother has custody during Christmas when the father does not. In other words, the mother has custody for the second half of Christmas holidays in the odd-numbered years, and she has custody for the first half of Christmas holidays in the even-numbered years, with December 25th at 2:00 p.m. marking the half-way point

of the Christmas holiday period. As to the custody arrangement, the trial court listened to twenty-nine hours of testimony, including the testimony of the court-appointed Dr. Kenneth Bouillion, who worked with Ryan and Mitch together and testified that both parties were good parents and that Mitch in particular provided more structure for Ryan with regard to academic performance. The court also read the testimony of counselor Barbara Walley, which was entered as a joint exhibit. Additionally, the court read the 2002 letters of the court appointed psychologists, Dr. Warren Lowe and Dr. Luke Elliot, who had evaluated Ryan and each parent individually and had jointly recommended adhering to a previous custody plan of seven-and-seven.

As Laura points out in her brief, La.R.S. 9:335(2)(a) provides: "The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents." Subsection (b) provides: "To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally." We see nothing in the seven-and-seven custody plan that runs counter to these provisions. In fact, the custody plan appears to provide exactly what the legislature intended. With regard to the plan's provision giving Mitch custody for the entire school year of 2006-2007, La.R.S. 13:4611(1)(e)(i) states that when one parent violates a custody and visitation order, the court can require that parent to allow additional visitation days to replace those denied the noncustodial parent. Moreover, La.R.S. 13:4611(1)(f) provides that a pattern of willful and intentional violation of the contempt statute, without good cause, may constitute a material change in circumstances warranting a modification of an existing custody or visitation order. Laura's argument on this issue is meritless.

18

Laura further contends that the notice and time allowed for trial preparation was inadequate. She argues that the order setting the custody trial date and an expedited hearing on interim custody, for the same date, was not signed until February 26, 2005 [sic], which only allowed three or four days for trial preparation. The record reveals that the order fixing the date of March 3, 2006 for trial on the merits was signed on February 25, 2006. The order set March 3, 2006 as the date for several pending rules including Mitch's request for permission to Amend and Supplement the Rule for Change of Custody, an expedited hearing on Interim Custody, the trial on the merits for Change of Custody, the *continuation* of the Rule for Contempt and the Request for Sanctions against Laura, filed on June 10, 2005. As Mitch points out, the contempt hearing against Laura had begun on November 7, 2005 before Judge Phyllis Keaty. However, Judge Keaty recused herself on January 4, 2006, and the matter was assigned to Judge Edwards.

Therefore, the custody and contempt matters had been ongoing since Mitch filed a request to change custody on April 27, 2005, and hearings had actually begun in November of 2005. All of the parties were on notice of the substance of the issues to be considered. As Mitch points out, there was little preparation required since the issues and the facts were the same. Moreover, we note that Laura does not argue, and the record does not indicate, that Laura requested or filed for a continuance of the trial date. At the hearing on her Motion for Partial Summary Judgment on Wednesday, March 1, 2006, the parties discussed having learned the previous Friday that they would be going to trial on the upcoming Friday, March 3rd, and counsel for Laura did not at that time object to the upcoming trial. In fact, at one point during the hearing on March 1, 2006, counsel for Laura stated, "I'm not suggesting that we continue the trial, Judge."

If counsel did not object to the trial date, and he participated in the proceedings, his client cannot now raise an objection. *See Cortina v. Gulf States Utilities-Cajun Elec. Power Co-op., Inc.*, 594 So.2d 1326 (La.App. 1 Cir. 1991), *writs denied,* 600 So.2d 666, 600 So.2d 667 (La.1992) (plaintiff participated in the proceedings on the day of trial without objection; any objection plaintiff had to the proceedings was waived). *See also Himel v. Landry,* 180 So. 428 (La.App. 1 Cir. 1938) (Defendant was denied a new trial or rehearing where she failed to show that she was deprived of making any defense on the merits of the case by reason of the trial going forward on a day fixed with her attorney's consent). After failing to object at the hearing on March 1, 2006, at the trial on the merits on March 3, 2006, counsel for Laura pointed out to the court that they had had less than ten days to prepare for trial. The court responded that the dates were set in response to a request for an expedited hearing, and the normal delays were not being honored. Counsel did not comment further, did not request a continuance, and clearly had not filed a motion for a continuance.

Laura contends finally that the trial court erred in ordering her to pay for two-thirds of the cost of counseling for the minor child. More specifically, the trial court's Joint Custody Implementation Plan orders both parents to complete specific parenting courses *and* to cooperate with Dr. Luke Elliot's efforts to coach the parents and to counsel Ryan on more functional methods to address their situations. The Joint Custody Implementation Plan orders Laura to pay two-thirds and Mitch to pay one-third of Dr. Elliot's counseling and coaching costs; the Plan also orders Laura and Mitch to split 50/50 the cost of Dr. Darlene Nemeth's neuropsychological assessment of Ryan. Laura argues that the assessment of these costs to her results in a modification of the child support obligation, which issue was not before the court.

We disagree. The assessment of these costs is not a modification of the ongoing child support obligation but is a separate, distinct and allowable assessment under La.R.S. 13:4611(1)(e)(iii) which provides that, as punishment for contempt, a trial court may require one or both parents to attend counseling.

If the court had ordered only Laura to attend counseling, she would have been responsible for the entire cost of the counseling. By ordering both to undergo counseling, and by ordering Laura to pay for two-thirds of the counseling costs, it is apparent that the trial court found Laura more liable for the necessity of counseling than Mitch. The court's allocation of two-thirds of the cost to Laura is not prohibited by La.R.S. 13:4611, nor does it constitute a modification of child support which covers the ongoing medical costs of the child. This assignment of error is also without merit.

Mitch answered the appeal in this case and assigns three errors. First, he asserts that the trial court abused its discretion in designating Laura as domiciliary parent, primarily because she failed to "facilitate and encourage a close and continuing relationship between the child and the other party" under La.Civ.Code art. 134(10). However, there are eleven other factors under Article 134, including love, affection, emotional ties, permanence of family unit, moral fitness, health, reasonable preference of the child, and the responsibility for the care and rearing of the child previously exercised by each party. There was strong evidence that Laura was a loving and caring mother and no evidence that Laura failed in any of the above-mentioned factors, and there was testimony that Ryan liked living with his mother. Therefore, we find no error in the trial court's maintaining Laura as the domiciliary parent.

Mitch also contends that the trial court erred in finding him in contempt of court for failing to attend assigned parenting classes. The record reveals that the Hearing Officer issued a Conference Report on May 25, 2005, recommending that both parents contact the Family Tree and enroll in the R.A.P.P. Program, and that Mitch enroll in the Best Dads program. Laura complied, and Mitch did not. Mitch filed a timely objection, and Judge Keaty signed a Temporary Order on June 1, 2005, ordering that the recommendations of the Hearing Officer be made a temporary order of the court pending the hearing on the rule to show cause. The Notice of the Signing of the Judgment went out on June 6, 2005. Laura filed a Rule for Contempt on December 22, 2005, which included allegations that Mitch was in contempt of court for failing to attend the assigned classes. On January 6, 2006, an Order was issued by the trial court setting the Rule to Show Cause on the contempt issue for March 7, 2006. The matter was heard during the custody trial, and Judge Edwards found Mitch in contempt and ordered him to pay a $500.00 fine, and also ordered him to serve seven days in jail *or* provide verification within fifteen days that he had enrolled in the recommended parenting classes.

Mitch argues that the assignment to take the classes was merely a hearing officer's recommendation, to which he timely objected, that the recommendation became an interim order only, and that he cannot be found in contempt where no court order was ever issued. He cites *Piccione v. Piccione*, 01-1086 (La.App. 3 Cir. 5/22/02), 824 So.2d 427, as authority for his position. In *Piccione,* a panel of this court set aside a contempt judgment rendered against Dr. Piccione for failing to pay spousal and child support in accordance with the recommendations of a hearing officer. There, the hearing officer had issued recommendations that were neither reduced to a written order nor filed into the record

22

of the proceeding. Both parties filed exceptions to the hearing officer's recommendations. Thereafter, Ms. Piccione filed a Rule for Contempt alleging that Dr. Piccione had failed to pay child and spousal support as recommended by the hearing officer. The trial court found Dr. Piccione in contempt and then we reversed.

In reaching our decision in *Piccione*, we considered La.R.S. 46:236.5 which authorizes the use of hearing officers in domestic matters, including support matters. We also reviewed the local district court rule relating to hearing officers and found that the local rule gave the hearing officer more authority than contemplated by the statute by allowing contempt proceedings against a party against whom no court order has ever been issued. However, the LeBlanc case herein is distinguishable from *Piccione*. The record in this case establishes, unlike that in *Piccione*, that the recommendations of the hearing officer were reduced to writing and were made a temporary order of the court, signed by Judge Keaty on June 1, 2005, and the Notice of Signing of Judgment went out on June 6, 2005.

The present case is more analogous to *Ackel v. Ackel*, WL 101823 (La.App. 5 Cir. 1/16/07), ___ So.2d ___, where an "interim judgment" was signed by the domestic commissioner, and when Mr. Ackel moved for a continuance of the trial court hearing on his objection to the hearing officer's recommendations, the district court judge signed an "interim judgment" ordering Mr. Ackel to pay his spouse final periodic spousal support in the amount of $1,500.00 per month. The court in *Ackel* distinguished the *Piccione* case, and found that the contempt proceedings in that case did not proceed against a party in the absence of a court order but, to the contrary, were to enforce the court order issued by the district court judge. While the Fifth Circuit Court of Appeal acknowledged that the interim judgment may have been entered in consideration of the hearing officer's recommendations, the court stated

23

that it was no less a court order for contempt purposes. Similarly, in the present case, Mitch violated a court order, based upon the hearing officer's recommendation but signed by District Court Judge Phyllis Keaty, and Judge Edwards did not commit legal error in finding him in contempt for the violation.

Lastly, Mitch contends that the trial court erred in not awarding Mitch the full amount of his attorney fees for Laura's contempt. The trial court may render judgment for costs and attorney fees against any party as the court may consider fair. La.Code Civ.P. art. 4550. This assignment of error is without merit.

IV.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed in all respects except that we modify the judgment to provide that the condition for the suspension of the seven-day jail sentence as to Laura LeBlanc be that she provide weekly reports to the trial court only, and not to Mitch LeBlanc personally, for the next three months, documenting her efforts to improve the relationship between Ryan and his father.

**AFFIRMED AS AMENDED.**

24