# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-580 C/W 19-581


**KIMBERLY JEANNE CHAMPAGNE MENARD**

**VERSUS**

**TONY JAMES MENARD**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20123952 C/W 20130131
HONORABLE CHARLES G. FITZGERALD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN E. CONERY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Phyllis M. Keaty, and John E. Conery, Judges.


**AFFIRMED.**

**Richard Ducote**
**Victoria McIntyre**
**318 East Boston Street, Second  Floor**
**Covington, Louisiana  70433**
**(985) 898-2755**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Kimberly Jeanne Champagne Menard**

**Anthony J. Fontana, Jr.**
**A Professional Law Corporation**
**210 North Washington Street**
**Abbeville, Louisiana  70510**
**(337) 898-8332**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Tony James Menard**

**CONERY, Judge.**

The mother of the minor child sought sole custody, advancing allegations of sexual abuse allegedly perpetrated by the child's father. The trial court initially ordered a period of supervised and then limited physical custody by the father while the parents were evaluated by a court-appointed psychologist. The mother continued pursuit of sole custody in the current proceedings, with the father seeking an increase in his periods of physical custody. Following protracted proceedings in the trial court, which included an unsuccessful motion to recuse, the trial court eventually found no merit in the mother's claims of sexual abuse by the father and entered an order granting the father increased physical custody, although the mother was named the domiciliary parent. The mother appeals. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Kimberly Menard filed a 2012 petition seeking a divorce from Tony Menard and seeking sole custody of the couple's minor daughter, A.L.M., born in June 2011. Although she withdrew that initial petition, Ms. Menard again filed for divorce in 2013,[1] seeking sole custody of the child. With the judgment of divorce entered by the end of 2013, Ms. Menard continued her custody claim and alleged that, at most, Mr. Menard should be provided with only supervised or restricted physical custody of the child. She requested that Mr. Menard "be ordered to undergo a mental health evaluation as to his propensity to commit molestation against a juvenile."

Following an April 2013 initial hearing officer conference, the hearing officer found insufficient evidence of Ms. Menard's allegations to warrant her requests for

---

[1] The successive petitions resulted in separate docket numbers, 2012-3952 and 2013-0131. The matters were consolidated below and remain consolidated before this court as 19-580 and 19-581, respectively. We address both matters by this single opinion.

sole custody or supervised visitation. Due to the nature of those allegations, however, the hearing officer recommended a psychological evaluation of both parties. The hearing officer further recommended that Ms. Menard temporarily be named domiciliary parent pending the evaluation and that Mr. Menard "have custodial periods … every Saturday from 10:00 a.m. until 4:00 p.m." She recommended that Mr. Menard's grandmother be present during his visitation.

The trial judge thereafter appointed Dr. Kenneth Bouillion, a clinical child psychologist, "to conduct a full scale mental health evaluation (Evaluation with psychological testing) of the parties and the minor child" and to render a report to assist the court with issues of custody and visitation. *See* La.R.S. 9:331.

Dr. Bouillion forwarded his report to the trial court in November 2013.[2] He described this initial evaluation as consisting of "several hours of clinical interviews and the completion of personality testing with the parents." Given the child's young age (two years and four months at the time), Dr. Bouillion did not interview the child. However, he reviewed records from the child's therapist, Dr. Latifey LaFleur. Dr. Bouillion advised the court that both parents were competent, knowledgeable of the child's needs, and capable of meeting those needs. He explained that, "obviously," the parents had "major communication problems and a long history of conflict" and advised the trial court not to appoint a domiciliary parent so as to improve the parties' cooperation. Dr. Bouillion recommended that Mr. Menard be provided with unsupervised visitation "following the principle of giving him fairly frequent contact but not necessarily for that long of a period of time that is appropriate to the child's

---

[2] This initial report was not introduced into evidence in later proceedings but was referenced throughout this matter and in Dr. Bouillion's subsequent reports. We reference the report, which is included in the record, for narrative purposes.

2

young age." He described it as "a good idea" for Mr. Menard not to bathe or attend to the child's bathroom needs. Although the report was directed to the trial court, the matter was not set for further consideration by the hearing officer or the trial court at that time.

Mr. Menard also filed a petition for custody in November 2014, noting that Ms. Menard had twice "raised extremely serious allegations" against him, "none of which has been substantiated." Mr. Menard explained that Dr. Bouillion's November 2013 report was submitted to the trial court and "speaks for itself." He sought joint custody of the child and status as co-domiciliary parent.

The matter returned to the hearing officer in January 2015. The hearing officer's report related the prior allegations of "inappropriate behavior between the father and the minor child" and noted Dr. Bouillion's evaluation. The hearing officer reported that, at the hearing, Ms. Menard "advised that the daughter is still exhibiting inappropriate behavior, as recent as last night. The mother characterizes her daughter's behavior as 'self-stimulating'." The hearing officer explained that when Mr. Menard, now remarried, exercised periods of physical custody, his wife, grandmother, and other members of the extended family "are usually present." Mr. Menard reported to the hearing officer that two criminal and two social services investigations had been conducted due to Ms. Menard's allegations and that "[n]either agency found sufficient evidence to support the allegations" against him. Given "the nature of the allegations made against him," however, Mr. Menard's wife "tend[ed] to all of [A.L.M.]'s bathroom needs."

The hearing officer recommended joint custody, with Ms. Menard named domiciliary parent and Mr. Menard awarded unsupervised physical custody each

3

Sunday[3] from 9:00 a.m. until 4:00 p.m. Due to "the serious allegations made against the father," the hearing officer recommended "that the father not handle or tend to any of the bathroom needs of the minor child." Judge Charles Fitzgerald, now assigned to the case, made the recommendations a temporary order of the court in February 2015.

Thereafter, Mr. Menard filed a first supplemental and amending petition for custody, now seeking sole custody of the child and alleging that Ms. Menard had "set into motion a pattern of doing everything possible to alienate the minor child from petitioner, to falsely and without any factual basis to accuse him of performing criminal acts upon the minor child[.]" Mr. Menard again explained that Ms. Menard reported him to police and social services "on at least two occasions[.]" Neither found "any facts to validate her complaints." He further accused Ms. Menard of refusing to nurture his relationship with the child.

Following both Mr. Menard's objection to the hearing officer's recommendations and the filing of his petitions, the matter returned to the trial court with a resulting order re-fixing all pending custody issues for a March 2016 hearing. The trial court ordered Dr. Bouillion "to conduct a mini-mental health evaluation" of the parties and child. Dr. Bouillion completed that evaluation, forwarding his March 10, 2016 report to the trial court.

Dr. Bouillion's report informed Judge Fitzgerald that his evaluation included clinical interviews with the parents and three separate interviews with the child, who was four years and eight months old at that time. He also interviewed the maternal

---

[3] This period of physical custody was changed to Sunday due to Mr. Menard's work schedule.

grandparents, with whom Ms. Menard and the child lived, and met with Dr. LaFleur, the child's therapist. Dr. Bouillion reviewed the child's medical records, and spoke with "Trent Borne, Child Welfare Speci[a]list with the Louisiana Department of Children and Family Services [(DCFS),]" as that agency had also investigated Ms. Menard's complaints.

Dr. Bouillion reported that Ms. Menard expressed concern regarding the child's alleged assertions of inappropriate touching by her father. Ms. Menard claimed that the child "engaged in sexual motions on a sporadic basis" and that she would "grab" her own "private parts" and those of others. While Ms. Menard took the child to the hospital emergency room earlier in the year after the child alleged "for the third time that her father touched her tu-tu[,]" "[n]o physical evidence was found[.]" Instead, the diagnosis was "chronic vaginitis, most likely due to overweight." Dr. Bouillion explained that this diagnosis had been made several times and that a steroid cream had been prescribed.

Dr. Bouillion also detailed his meeting with Dr. LaFleur, explaining that the therapist worked with the child numerous times in 2013-2016. Dr. LaFleur informed Dr. Bouillion that although the child was unable to provide specific details or a timeline, the child told the therapist that she did not like going to her father's home "because he touches me." Dr. Bouillion reported that "Dr. LaFleur did not develop a diagnosis of child sex abuse, nor did she refer a complaint to [the] Child Protection Agency [(DCFS)]." Dr. Bouillion's telephone conversation with Mr. Borne of the DCFS confirmed that he found "no objective basis in fact that these latest allegations are valid examples of child sexual abuse." Dr. Bouillion described the family's situation as one of "high conflict" and that there could have been "increased tension with the mother and her family after the father was given unsupervised visitation

5

early last year." He explained that, "None of the medical doctors, nor Dr. LaFleur or myself have been able to confirm an impartial diagnosis of child sexual abuse as there is no confirming or collaborating data based on time place and circumstance." Dr. Bouillion continued, stating that Mr. Menard "is able to call multiple witnesses who can attest to the fact that during the past two or three years he has not attended to any of [the child's] bathroom duties and is rarely alone with her."

Dr. Bouillion recommended a gradual increase in Mr. Menard's periods of physical custody to include overnight visits. He further recommended that Mr. Menard participate in the child's "therapeutic work" with Dr. LaFleur "in order to address her continued repetition of her allegations of inappropriate touching." He opined that "[i]t may be likely that [the child] has increased focus on her private parts because of her medical problems related to them."

The trial court conducted the resulting custody hearing over two days in March 2016. Dr. Bouillion, presented as Mr. Menard's witness, testified along the lines of his reports, which were also introduced into evidence.[4] In support of her case, Ms. Menard called Dr. Viola Vaughan-Eden as a witness at the trial on March 16, 2016. The trial court accepted Dr. Vaughan-Eden as an expert in the field of clinical social work, specifically in the assessment of child sexual abuse. Dr. Vaughan-Eden explained that she reviewed the child's medical records and interviewed members of Ms. Menard's family. She did not interview or meet with either the child or Mr. Menard. Nor did she speak with Dr. LaFleur or review her records. Based on her evaluation of symptoms and medical findings in the reports

---

[4] As explained by the trial court, Dr. Bouillion's second and third reports were introduced into evidence as "substantive evidence" pursuant to the relaxed evidentiary standard of La.Code Evid. art. 1101(B)(2). *See Folse v. Folse*, 98-1976 (La. 6/29/99), 738 So.2d 1040.

submitted to her for review, Dr. Vaughan-Eden offered her opinion "that to a reasonable degree of medical certainty this child is experiencing sexual abuse."

Dr. Bouillion returned to the stand on the second day of the hearing and was critical of Dr. Vaughan-Eden's failure to interview the child or Dr. LaFleur. He also felt that Dr. Vaughan-Eden was lacking certain data in terms of "frequency of certain things" and that "there was an exaggeration of the amount of sexualized play that this child has exhibited, particularly, in the last two years." He also questioned Dr. Vaughan-Eden's attribution of certain self-stimulating activity to sexual abuse. Dr. Bouillion instead reasoned that those instances were possibly attributable to non-abusive factors, including the medical conditions for which the child was diagnosed. At the close of the second day of the hearing, the parties sought a continuance from the trial court so that additional discovery could be conducted. No formal custody order was entered at that time.

After well over a year and a half had elapsed with no court hearing scheduled, Mr. Menard again sought a hearing to consider all pending custody matters. The trial court set the hearing for March 27, 2018 but, on that same date, continued the matter until June 25 and 26, 2018. He ordered Dr. Bouillion to conduct an additional "mini-evaluation" of the parties and the child. The trial court further reinstated the February 2015 temporary order of custody.

Prior to the June hearing, Ms. Menard filed a motion for recusal in April 2018 after learning of the trial court's recent employment of Ms. Martin, Mr. Menard's attorney's daughter, as an administrative assistant. Detailed below, Judge Michele Breaux was randomly assigned to consider the recusal question. She denied the motion following a July 2018 hearing and rendered a judgment formally denying Judge Fitzgerald's recusal on September 24, 2018.

7

The merits of the custody matter was finally heard in November 2018, more than six years from the initial July 2012 petition for divorce and custody commencing the matter. Dr. Bouillion presented trial testimony detailing his most recent court-ordered evaluation, completed in September 2018. His report was also taken into evidence. Referring the trial court to his November 2013 and March 2016 evaluations, Dr. Bouillion explained that his most recent evaluation again included individual clinical interviews with Ms. Menard and Mr. Menard, as well as Mr. Menard's current wife, Meagan. He also interviewed the child, who was seven years and three months old at the time of the report. He interviewed the child individually and with her parents.

Dr. Bouillion explained that Ms. Menard reported that the child's health had been good and that she had not had urinary tract infections over the course of the previous year. Ms. Menard testified similarly at the hearing. Transition periods associated with Mr. Menard's physical custody were also improved during that period. Dr. Bouillion reported that at the time of his latest evaluation in September 2018, there had been no attempts by the child to inappropriately touch others, as had been previously reported. Mr. Menard explained to Dr. Bouillion that for the previous one and a half years, the child had been able to care for her own "bathroom duties." Dr. Bouillion reported that the child appeared "quite relaxed and comfortable" with her father, Mr. Menard, and Meagan, and that she stated that she enjoyed being in their company. Dr. Bouillion explained that the child sought more time with her father for fishing and camping and that she was "willing to sleep over in her own room in her father's house with her dog in the bed with her." He observed that the child appeared "to be making an excellent adjustment in a difficult situation."

8

Dr. Bouillion again recommended that the trial court begin increasing Mr. Menard's physical custody periods, possibly including overnight visits on the weekends initially and, eventually, alternating weekly visitation.

In addition to Dr. Bouillion, the trial court heard trial testimony from Ms. Menard and her family members. Ms. Menard and her mother reported that the child had recently reported that her father had touched her, although it was also admitted that the child's health had improved and that it had been some time since they witnessed the child self-stimulating. In support of his own position, Mr. Menard testified as to his close relationship with his daughter, denying having ever touched her inappropriately. Mr. Menard, Meagan, and Mr. Menard's mother testified regarding efforts taken during his Sunday physical custody periods to ensure that he was not left alone with the child.

Following a brief recess at the close of the hearing, the trial court offered extensive reasons for ruling and, in addressing the best interest of the child factors of La.Civ.Code art. 134, described the case "turn[ing] as a practical matter on whether or not sexual abuse [w]as proven by a preponderance of the evidence." The trial court concluded that it was not, and spoke at length regarding the absence of evidence of that allegation. The trial court referenced the short period of time that Mr. Menard was able to see the child each week, and the near constant presence of others in finding that there was "no chance" of veracity to the allegations of inappropriate touching. Concluding that neither party established the need for sole custody, the trial court awarded joint custody, with Mr. Menard afforded periods of physical custody to increase over time. The trial court named Ms. Menard as the domiciliary parent.

Ms. Menard appeals, assigning the following as error:

9

A. The trial court, Judge Michele Breaux, clearly erred as a matter law and manifestly abused its discretion in refusing to recuse Judge Fitzgerald, where Mr. Menard's attorney's daughter became Judge Fitzgerald's judicial administrator during the trial recess.

B. The trial court clearly erred and manifestly abused its discretion in finding that there was no evidence of the child's abuse by the father, when the trial court completely ignored the compelling expert testimony from Dr. Viola Vaughan-Eden.

C. The trial court clearly erred and manifestly abused its discretion in failing to properly apply the child custody best interest factors set forth in C.C. art. 134, particularly art. 134(A)(1) which deems the "potential for the child to be abused" the primary consideration.

D. The trial court clearly erred as a matter of law in failing to grant Ms. Menard the child's sole custody, and in allowing Mr. Menard extensive unsupervised contact with the child.

E. The trial court clearly erred as a matter of law and abused its discretion in assessing any costs against Ms. Menard, instead of taxing Mr. Menard with all costs.

## LAW AND DISCUSSION

*Motion to Recuse*

In this first assignment of error, Ms. Menard asserts that Judge Breaux, who was randomly allotted to consider the motion to recuse, committed legal error in failing to recuse Judge Fitzgerald. Ms. Menard's motion alleged that recusal was required given the fact that Judge Fitzgerald had hired Mr. Menard's attorney's daughter, Allison Martin, during the two-year recess of the trial occurring between March 2016 and March 2018.

The evidence at the recusal hearing demonstrated that when the matter recommenced on March 27, 2018, Judge Fitzgerald held a pretrial conference with counsel for the parties in order to discuss the need, after a two-year delay, for an updated evaluation and report from court appointed expert, Dr. Bouillion. At that conference, Judge Fitzgerald informed Ms. Menard's counsel of the hiring in

10

October 2017 of opposing counsel's daughter, Ms. Martin, and introduced her in chambers.

When the parties returned to open court, Judge Fitzgerald allowed the parties to place on the record any discussion in chambers they wished to preserve. In particular, he granted leave for Ms. Menard to file what became her April 25, 2018 recusal motion. The motion was predicated on Ms. Menard hearing from her counsel that Ms. Martin, opposing counsel's daughter, had been hired in the interim as Judge Fitzgerald's office administrator.

Judge Fitzgerald was the first witness called to testify by Ms. Menard's counsel, Mr. Richard Ducote, at the recusal hearing. Judge Fitzgerald related his disclosure of the fact that he had hired Ms. Martin as his office administrator during the matter's two-year recess. He also provided a history of his working relationship with Ms. Martin, noting that she previously worked at his former law firm, Cox Fitzgerald. When Judge Fitzgerald was elected to the Fifteenth Judicial District Court bench in November 2014, he asked Ms. Martin to work as his office administrator, but she declined at that time.

Judge Fitzgerald told Ms. Martin that she had a standing offer and to let him know if she ever changed her mind. When his first judicial office administrator left in October 2017, Judge Fitzgerald wanted to call Ms. Martin and offer her the job. Before doing so, however, he testified that he extensively researched the issue of recusal before hiring her, as her father, Mr. Anthony Fontana, had approximately seventy cases pending before Judge Fitzgerald in his Division. Many of these cases were before the court in Vermilion Parish, part of the Fifteenth Judicial District, and the Parish where Mr. Fontana has his office and is one of only a few attorneys practicing family law. Judge Fitzgerald testified, "So I wanted to make darn sure

11

essentially there wouldn't be a problem in my opinion, from a conflict standpoint, from a recusal standpoint, from an impartiality standpoint."

In an effort to further conduct due diligence on the issue, Judge Fitzgerald reviewed "Code of Civil Procedure Article 151, got very familiar with it, read all the reported decisions."[5] He further reviewed the "Code of Judicial Conduct, Canons 1, 2, and 3,"[6] and the "set of advisory opinions" received each year from the "Supreme

---

[5] Louisiana Code of Civil Procedure Article 151 provides, in pertinent part:

A. A judge of any court, trial or appellate, shall be recused when he:

(1) Is a witness in the cause;

(2) Has been employed or consulted as an attorney in the cause or has previously been associated with an attorney during the latter's employment in the cause, and the judge participated in representation in the cause;

(3) Is the spouse of a party, or of an attorney employed in the cause or the judge's parent, child, or immediate family member is a party or attorney employed in the cause; or

(4) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys or any witness to such an extent that he would be unable to conduct fair and impartial proceedings.

B. A judge of any court, trial or appellate, may be recused when he:

(1) Has been associated with an attorney during the latter's employment in the cause;

(2) At the time of the hearing of any contested issue in the cause, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm), and in this case the employment shall be disclosed to each party in the cause;

(3) Has performed a judicial act in the cause in another court; or

(4) Is related to: a party or the spouse of a party, within the fourth degree; an attorney employed in the cause or the spouse of the attorney, within the second degree; or if the judge's spouse, parent, child, or immediate family member living in the judge's household has a substantial economic interest in the subject matter in controversy sufficient to prevent the judge from conducting fair and impartial proceedings in the cause.

[6] In pertinent part, the Canons provide:

**CANON 1  A Judge Shall Uphold the Integrity and Independence of the Judiciary**

Court Committee on Judicial Conduct." Judge Fitzgerald testified that following that research:

> I made the conclusion that it wasn't even close in terms of presenting- let me say it this way. I actually met with Judge Blanchet before I made the decision to hire Ms. Martin. And I told him, … "there's no way I would ever hire anybody if that meant that I'm dumping 70 cases on you. I'm just not doing it."[7] So then after I educated myself in terms of the law in detail, at this point I think I've read every reported decision from any intermediate Appellate Court, the Supreme Court, read every advisory opinion by the Louisiana Supreme Court Committee on Judicial Conduct and, again, there's nothing that's even close to the issue here. Why? Because in terms of the impartiality, I've got a duty to decide cases. This has no bearing on it.

---

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code are to be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.

**CANON 2  A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All Activities**

**A.** A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

As used in this Code, "impartiality" or "impartial" denotes absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintaining an open mind in considering issues that may come before the judge.

**CANON 3  A Judge Shall Perform the Duties of Office Impartially and Diligently**

The judicial duties of a judge take precedence over all other activities. Judicial duties include all the duties of office prescribed by law. In the performance of these duties, the following standards apply:

**A. Adjudicative Responsibilities.**
(1) A judge shall be faithful to the law and maintain professional competence in it. A judge shall be unswayed by partisan interest, public clamor, or fear of criticism.

....

**C. Recusation.** A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule. In all other instances, a judge should not recuse himself or herself.

[7] The Fifteenth Judicial District has a system whereby two of the elected judges serve as Family Court Judges for all three parishes in the District. Judge Blanchet is the only other judge assigned to the Family Court docket.

Judge Fitzgerald explained that when he was "satisfied that hiring Ms. Martin would not create a ground, either mandatory or a discretionary ground for recusal, then I … offered her the job. And so[,] I was thrilled whenever she accepted." Judge Fitzgerald hired Ms. Martin as his office administrator in October 2017.

Judge Fitzgerald continued, describing his office procedures regarding Ms. Martin's day-to-day duties, stating, "Ms. Martin is not my staff attorney … Ms. Martin and I have no discussions on substantive legal issues. It's all administrative, court dates and things of that nature." He then described the procedures in place whenever Ms. Martin's father appears before him and stated:

> [T]wo things happen. I disclose it immediately to the attorneys that are in front of me. And, number two, she [(Ms. Martin)] does nothing in the case. I mean, she doesn't even make phone calls. She's not allowed to actually pick up the phone to say that, "Hey, is this date good for you in terms of court dates?" And so[,] we go out of our way to avoid any appearance of impartiality [sic].

Judge Fitzgerald again referenced his prior research into the law of recusal and testified that if he had not been certain her hiring would not create a recusal in her father's cases pending in his division of court, he would have called to explain to Ms. Martin that he was unable to hire her. In light of his research, however, Judge Fitzgerald ultimately concluded that it was not inappropriate for him to hire an office administrator who he had worked with previously, who had the personality that suited his office staff, and who he felt was the best person for the position. Judge Fitzgerald never discussed the recusal issue with Mr. Fontana, Ms. Martin's father, and at the time of the recusal hearing, no other recusal motion had ever been filed based on Ms. Martin's position on his staff.

Mr. Ducote questioned Judge Fitzgerald about an exchange between Ms. Martin and her father that occurred before the scheduled third day of trial on March

27, 2018. Namely, Mr. Ducote witnessed Mr. Fontana and his daughter, Ms. Martin, hugging in the hallway of the courthouse. This encounter occurred prior to the beginning of court, and also prior to the pretrial conference that took place in chambers with counsel and at which Judge Fitzgerald disclosed Ms. Martin's position in his office. That discussion in chambers was placed on the record.

Prior to this disclosure, Mr. Ducote, who is from Covington, had no idea who Ms. Martin was at the time of the encounter he witnessed in the hallway. Judge Fitzgerald also testified he knew nothing of the exchange between father and daughter but was following his usual protocol of full disclosure when any attorney in a case with Mr. Fontana came before his court. In discussion with the trial court concerning the timeline of the hallway encounter, Mr. Ducote replied:

> MR DUCOTE: That's the same day. That's when we came for trial. And that was before the pretrial hearing. We then had the pretrial hearing. That's when I was introduced to Ms. Martin and learned who she was. That's when we had the discussion in chambers. That's when we had the discussion on the record. I spoke to my client and informed Judge Fitzgerald that I felt compelled, no matter who the Judge was, no matter who the opposing counsel was, no matter who the daughter was, just giv[en] the situation and the relationship that I would have to bring the motion to recuse.

Mr. Ducote further confirmed in an exchange with the trial court, "I had no idea that she worked with the Judge or anything else. That's how we learned in Judge Fitzgerald's chambers." Mr. Fontana agreed that these facts concerning what occurred the morning of the scheduled third day of trial were correct.

However, Mr. Ducote went on to further explain his position to the trial court that:

> And I just want to make it clear. This has nothing to do with the merits of the case. It has nothing to do with any allegation of impropriety on Judge Fitzgerald's part, Ms. Martin's part. It's the – and I refer to what I've put in my motion, it's the "LaCaze" case and the new developments about the basis of recusal over and above what was

generally the strict application of Article 151. So[,] it's not about inner (sic) personalities.

On cross examination, Mr. Fontana discussed La.Code Civ.P. art. 151, and questioned Judge Fitzgerald about whether there was any discussion in Article 151 of "optics," a word used by Mr. Ducote to describe Ms. Martin's employment. Judge Fitzgerald replied, "No. Not in the interpretation of Article 151." Mr. Fontana also asked if there was anything in Article 151 that spoke "about a relationship that is non-legal to be a source of recusal for a Judge?" Judge Fitzgerald replied, "Not in Article 151 – if I understand the question, not in Article 151."

Mr. Fontana then asked Judge Fitzgerald, "'In all of these cases where you made the disclosure to out of town attorneys, in town attorneys, not a single one of them –I'll use his word, 'optics' – not a single one said, 'The optics here look bad. You ought to get out of the case?'" Judge Fitzgerald replied, "Not one. Not even a hint. Not even a comment."

Mr. Ducote questioned Judge Fitzgerald on redirect examination about his duty to the litigants who appear before his court. Judge Fitzgerald responded:

> My primary duty is what I took an oath to do, it's to apply the laws of the State of Louisiana to the facts of every case without bias or prejudice. And it's to make darn sure. I mean … that's my number one duty, first and foremost. Number two is to comport with the Code of Judicial Conduct and all the ethical canons therein. And again, I think, we're circling back to Canon No. 3. [Louisiana Code of Civil Procedure Article] 151 talks about essentially, bias in favor of an attorney, whether or not there's such a bias that I can't rule in a fair and impartial manner. Canon 3 talks about the impartiality and the perceptions that the public and the creation of perhaps an atmosphere … impartiality and the appearance of impropriety … I would not have hired Ms. Martin if I would've concluded that this is going to create an appearance of impropriety that's sufficient - - I don't think it's close … But if I thought it was close, honestly, then I would've declined. I would not have hired Ms. Martin. It is that important to me to avoid the appearance of impropriety.

16

Judge Fitzgerald then testified that in all the cases, both before and since he hired Ms. Martin, he had ruled from the bench, doing so both for and against Mr. Fontana's clients. Both attorneys explained for the record that they had a good working relationship with Judge Fitzgerald. Mr. Ducote again stressed that this was a "unique situation" and that the filing of the motion was "not anything personal."

Ms. Menard was then questioned as a witness and asked what finding out that Mr. Fontana's daughter was working for Judge Fitzgerald had done, "to your confidence in the judicial proceedings?" Ms. Menard responded,

> I mean, it is really - - for me, you know, I've been fighting for my child for years. So just to learn about that, you know, I mean, it's just the way that it -- I mean, knowing that that's his daughter and he [sic] works for the Judge, it just -- it doesn't look good, I mean, and I've -- you know, I've been through enough, and I'm still fighting for her, so -- my daughter. So[,] it doesn't look good on my part, not like the way it looks.

When Ms. Menard was asked, "Would you have the same degree of confidence if his daughter was not working for the Judge," she responded, "No. . . . . And, I mean, we had just found out. So it was like it just -- it just changed the way I felt -- you know, I felt about how it was gonna turn out, how the ruling was gonna turn out." On cross examination, Ms. Menard was asked whether Mr. Ducote had tried to convince her that Judge Fitzgerald was fair, was a good judge, and that he had tried cases before him before. She responded, "The only thing he told me what Judge Fitzgerald had disclosed and that was all. He left it up to me."

After closing arguments and a brief recess, Judge Breaux rendered oral reasons for ruling on the record on the recusal issue and stated in pertinent part:

> So what is before me is a motion to recuse. I have read "State of Louisiana versus Rogers LaCaze." It hadn't even been published yet. The opinion was handed down on March the 13th 2018 by Justice Weimer. I think this case gives an in-depth and excellent analysis of the standard for recusal to the point that I am going to actually quote

17

from the case … let me preface it with this, which I'm sure both of you have read the case. This is a criminal case, as opposed to civil. All right. And this case went into a lot of your due process. All right. So it says, "A judicial disqualification under the due process clause first requires that an objective probability of actual bias be established." And I'm going to put emphasis on "actual," the word "actual" bias be established. "Thus the State correctly notes that proof of an appearance of bias, alone, is insufficient to show a violation of federal due process. The Rippo standard clearly requires proof that an appearance of bias gives rise to a "probability of actual bias," - - and that's in quotes - - "also referred to a risk of bias or potential for bias. Secondly, the defendant must prove that the probability of actual bias rises to a level that is too high to be constitutionality tolerable under the circumstances." It goes to the next page, it says, "Under the standard, proof of any probability of bias, alone is insufficient." You take that, I read that case.

After the discussion of *State v. LaCaze*, 16-0234 (La. 3/13/18), 239 So.3d 807, *cert. denied*, _ U.S. _, 139 S.Ct. 321 (2018), Judge Breaux indicated that she had conducted her "own research, read a number of cases on recusal, and I thought one was particularly close to our factual situation." In this latter regard, Judge Breaux cited *Southern Casing of Louisiana, Inc. v. Houma Avionics, Inc.*, 00-1930 (La.App. 1 Cir. 9/28/01), 809 So.2d 1040, a case the trial court characterized as an "attorney versus Judge relationship[.]" Distinguishing *Southern Casing*, Judge Breaux explained that, "In our factual scenario today, we are talking about a court administrator versus an attorney. This court finds a huge distinction between attorney/Judge and court administrator and attorney." *Southern Casing* involved the request to recuse a judge based on his relationship with an attorney. She further stated:

> Judge Fitzgerald testified extensively about the relationship of his office administrator and what lengths and protections that he has gone through in relation to when his office administrator and the attorney, who is also her father, what protections he takes. And again, he testified extensively about that.

> With that said, the law is specific. And it goes on and it states, "A Judge is presumed to be impartial." I'm going back and I'm relying on an old Code of Civil Procedure, Article 151, which enumerates the

18

exclusive grounds for recusal. And it does not list -- and, again, I'm quoting, "a substantial appearance of the possibility of bias or even a mere appearance of impropriety as causes for removing a Judge from presiding in a given action. The bias or prejudice must be of a substantial nature and based on more than conclusory allegations." That is important to this Court, that it cannot be based on mere conclusions. It must be and rise to the level of actual bias.

All of that said, this Court, after the testimony from Judge Fitzgerald and Ms. Menard, that there was no evidence of any instance of actual bias. The litigant may -- in her optic vision, as that word has been used several times, may see or may -- the mere appearance of a relationship form of bias, but this Court was never given an actual situation where a bias existed.

With that said, the Court finds that the mover has not met the burden to recuse. Therefore, the motion is denied.

As noted, Ms. Menard asserts that Judge Breaux applied the wrong legal standard to the facts presented and, accordingly, requests that this court apply a *de novo* standard of review. In particular, she argues that the trial court incorrectly found that as a matter of law, **proof of actual bias** was required for Judge Fitzgerald's recusal and that she relied solely on the case of *Southern Casing*, 809 So.2d 1040. Ms. Menard asserts that *de novo* review is required. We do not agree.

We note that the applicable standard of review of the recusal issue is one for abuse of discretion. *See In re Harrier Trust*, 18-651 (La.App 3 Cir. 10/17/18), 259 So.3d 488, *writ granted in part on other grounds*, 18-1467 (La. 2/18/19), 263 So.3d 884. *See also Southern Casing*, 809 So.2d 1040.

The present legal standard for the recusal of a trial judge is found in the *per curium* opinion of a panel of this circuit in *Daurbigney v. Liberty Personal Insurance Co.*, 18-929 (La.App. 3 Cir. 5/9/19), 272 So.3d 69. The panel in *Daurbigney* held that in order to recuse a judge from a case, the moving party was required to prove that "objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Id.* at 73 (quoting *Rippo*

*v. Baker*, _ U.S. _, _, 137 S.Ct. 905, 907 (2017)). *See also State v. Daigle*, 18-634 (La. 4/30/18), 241 So.3d 999; *LaCaze*, 239 So.3d 807.

*Daurbigney* was published in May 2019, almost a year after the judgment denying the motion to recuse was issued in this case. The panel in *Daurbigney* found that the "unique circumstances" in that case required recusal. *Daurbigney* involved a judge's campaign ad that personally attacked a group of attorneys, including the attorney then representing a client in a case before that judge. No such compelling facts appear in this case.

Judge Breaux's reasons in this case include the great lengths taken by Judge Fitzgerald to preclude Ms. Martin, his office administrator, from any participation of any kind, including any of her administrative duties, in any case involving her father. Circumstances we find to be far different than the facts in *Daurbigney.*

After a comprehensive and thorough review of the record on this issue, and given the unique facts on the record before us, we maintain Judge Breaux's denial of the motion to recuse. Her denial was plainly based on a finding that no evidence of any bias or probability of bias on the part of Judge Fitzgerald would support his recusal. The record supports that finding as the only suggestion of bias—objective or otherwise—was attributable only to Ms. Menard's allegation or conclusion of such. She presented no evidence that the "probability of actual bias rises to a level that is too high to be constitutionally tolerable under the circumstances" based on the singular factor of Ms. Martin's presence in Judge Fitzgerald's office as his office administrator. *See Daurbigney*, 272 So.3d 69. To the contrary, Judge Fitzgerald testified at length regarding Ms. Martin's strictly administrative functions in his office, as well as screening measures employed to distance Ms. Martin from even

20

routine administrative duties in those cases involving her father, Mr. Fontana. We affirm the trial court's September 24, 2018 judgment denying the motion to recuse.

*Factual Finding – Sexual Abuse*

In her second assignment of error, Ms. Menard contends that the trial court manifestly erred in failing to account for Dr. Vaughan-Eden's testimony in the determination that there was no credible evidence of sexual abuse by Mr. Menard of his minor daughter A.L.M. Ms. Menard's attorney described Dr. Vaughan-Eden as "unquestionably the most qualified child sexual abuse expert in the case." Relying on the entirety of Dr. Vaughan-Eden's testimony, Ms. Menard points with particularity to the expert's statement that:

> I believe that to a reasonable degree of medical certainty this child is experiencing sexual abuse. The symptoms when you take the medical findings, and you take the sexualized behaviors if, indeed, are occurring, and then you take the kind of - - the degree to which the other - - There's sexualized behavior with inanimate objects, there's sexualized behavior without children, there's attempted sexual behavior or inappropriate touching of adults, and then the child's statements that they are being touched. When you take all that together, it's really to - - trying to rule out what else could be happening. It's a pretty high probability - - Sexualized behavior at this level doesn't, generally, occur. I can't think of anything where it would occur in some fashion without there being some sexual abuse. And I will define sexual abuse. Sexual abuse, meaning sexual - - actual touching[,] fondling, or sexual exposure to some pornography like some really inappropriate sexual behavior.

Drawing on this position, Ms. Menard asserts that the type of behaviors described by Ms. Menard and her family, coupled with "complaints that her father was touching her genital area, are the kinds of evidence that support findings of child sexual abuse." Ms. Menard references four cases for this proposition, citing *State v. Brown*, 14-1110 (La.App. 4 Cir. 4/29/15) (unpublished opinion) (2015 WL 2067283), *writ denied*, 15-1272 (La. 6/3/16), 192 So.3d 755; *Varney v. Varney*, 12-640 (La.App. 3 Cir. 12/5/12) (unpublished opinion) (2012 WL 6028889); *C.L.S. v.*

21

*G.J.S.*, 05-1419 (La.App. 4 Cir. 3/7/07), 953 So.2d 1025, *writ denied*, 07-0710 (La. 4/27/07), 955 So.2d 698; and *State ex rel. S.G.*, 95-2063 (La.App. 1 Cir. 3/25/96), 676 So.2d 109.

Each of the cited cases, however, is one in which *the trier of fact found the behavior indicative of sexual abuse*. The appellate court maintained that finding in each of the cases, doing so under the deferential manifest error standard of review as applicable to the respective case under review. Although we also consider this case under such a deferential standard, the trial court in this case determined factually that *the evidence did not support a finding of sexual abuse*. Thus, the fundamental starting point of the inquiry differs in this case. The type of behaviors *alleged* by Ms. Menard does not require the trial court to accept that those behaviors actually occurred or that the child's alleged statements and behavior stemmed from sexual abuse.

We note that an appellate court will not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *See Stobart v. State, ex rel. DOTD,* 617 So.2d 880 (La.1993). This court has explained that "[t]his is especially applicable in a child custody dispute wherein appellate courts accord substantial deference to the trial judge's conclusions." *LeBlanc v. LeBlanc*, 06-1307, p. 4 (La.App. 3 Cir. 3/7/07), 953 So.2d 115, 119.

Particularly applicable to this assignment is the supreme court's explanation that "whether sexual abuse occurred is a factual finding that belongs within the province of the trial court's decision-making function." *C.M.J. v. L.M.C.*, 14-1119, p. 21 (La. 10/15/14), 156 So.3d 16, 31. "Expert witnesses are intended to 'assist the trier of fact' in understanding the evidence or in the determination of a fact in issue." *Id.* (quoting La.Code Evid. art. 702). However, the trial court is not bound by an

expert's testimony. *Id.* The trial court instead weighs expert testimony, the same as other evidence, and "may accept or reject in whole or in part the opinion expressed by an expert." *Id.*

The trial court did not ignore Dr. Vaughan-Eden's opinion regarding the likelihood of sexual abuse in this case. Rather, his extensive reasons clearly demonstrate that he carefully weighed any such testimony in comparison with that of the court-appointed expert, Dr. Bouillion, who had multiple visits with A.L.M. over several years. Not only was the assessment of the evidence the trial court's prerogative as trier of fact, our review indicates that his decision is fully supported by the record.

Significantly, as opposed to Dr. Bouillion, Dr. Vaughan-Eden informed the trial court that she did not speak to the child. Nor did she speak to Dr. LaFleur, the child's therapist who had met with the child thirty-two times by the time of the March 2016 hearing[8] when Dr. Vaughan-Eden gave her opinion. She instead explained that she reviewed medical records and interviewed Ms. Menard and her family. She did not interview Mr. Menard or his family members. Also, Dr. Vaughan-Eden's opinion testimony was limited to the facts available up to the March 2016 hearing. She did not appear at the November 2018 hearing, nor did Ms. Menard produce an updated report from Dr. Vaughan-Eden following her initial 2016 consideration.

In contrast, the court appointed expert, Dr. Bouillion, who has extensive experience in child sexual abuse cases, relied on considerably more expansive data in producing three reports over a five-year period, the last of which was dated

---

[8] According to Ms. Menard, the child stopped seeing Dr. LaFleur "a few years" prior to the final 2018 hearing in this matter.

September 27, 2018. He offered in-court testimony regarding his evaluation at the final, November 2018 hearing. Through the course of his lengthy participation in this case, Dr. Bouillion interviewed the parties multiple times and also interviewed the child's stepmother and maternal grandparents. Unlike Dr. Vaughan-Eden, Dr. Bouillion interviewed the child numerous times, doing so both individually and with her parents. He spoke with Dr. LaFleur regarding her thirty-two therapy sessions with the child as well as with the DCFS child welfare specialist, Mr. Borne, who explained that he found "no objective basis in fact" that the allegations made by Ms. Menard were "valid examples of child sexual abuse."

Dr. Bouillion also considered medical records and referenced those medical records in disputing Dr. Vaughan-Eden's contention that reports of the child's self-stimulation were evidence of sexual abuse. Dr. Bouillion explained that, to the contrary, the child's history of urinary tract infections and vaginitis "may well lead to more stimulation" and that "[w]hen you hurt or you itch kids touch more[.]" He further observed that, despite the fact that the child had "been to the doctor many times … with these symptoms … there's been no diagnosis of child sexual abuse in this case." Nor did any of the mandatory reporters who examined the child throughout the history of the case conclude such abuse had taken place.

In rejecting Ms. Menard's allegations, the trial court made specific, comprehensive factual findings and explained it was not only considering the issue of the occurrence of sexual abuse, but whether Mr. Menard was the perpetrator of any such abuse. While Dr. Vaughan-Eden offered an opinion as to the likelihood of occurrence of sexual abuse, she explained to the court that she had been asked to speak only to the likelihood of sexual abuse in light of a "compilation of symptoms" and that she "can't say that it was a specific person that did it[.]" The trial court,

24

however, noted that Mr. Menard had exercised only very limited physical custody over the child and did so only in the presence of first, his grandmother, and later, his wife. The court explained that: "I'm not finding that it would have been impossible, I'm finding it's not even in the same universe in terms of proving by preponderance of the evidence that Dad committed sexual abuse." The trial court continued and considered the child's remarks regarding her father touching her within the larger hostile environment in which they occurred.[9]

As noted by Dr. Bouillion, the trial court remarked that although the child was seen over the years by various professionals who were mandatory reporters, "no reports w[ere] made in this case." With regard to the period in which the healthcare providers saw the child for a condition identified as vaginitis, the trial court explained that "none of them actually felt a need to actually report any concerns to D.C.F.S." Finally, the trial court explained that, although Ms. Menard's accusations resulted in repeated investigations by social services and law enforcement, "nothing has ever been validated."

In light of these factual findings by the trial court, we find no manifest error in the trial court's eventual determination that sexual abuse was not proven by the evidence presented and that Mr. Menard had not been proven to have sexually abused his daughter. Neither do we find that the trial court abused its discretion in

---

[9] The trial court explained that:

I'm pretty sure [the child] understand[s] what you don't want to hear Mom, is that she loves her father and I'm pretty sure - - listen, kids I'm not going to get into conflict loyalties and all of that but I am going to repeat I think from a very early stage [she] understood, essentially, there was no love or affection between the two of you.… Whenever you're inspecting her vagina before and after each visit, whenever you have, essentially, four adults going to an exchange and Dad has also got adults, the hostility is probably palpable. Kids can sense all that. When she gets back I'm pretty sure she understands if she wants your undivided hyper-attention, hyper-focus all she has to do is say something.

its decision to accept the testimony of Dr. Bouillion given the limited information relied upon by Dr. Vaughan-Eden, including the fact that her opinion had not been updated since 2016.

*Best Interest of the Child – Potential for the Child to Be Abused*

In her third assignment of error, Ms. Menard briefly references the trial court's consideration of the legal factors involved in child custody determinations, focusing on the first such factor, "[t]he potential for the child to be abused[.]" *See* La.Civ.Code art. 134(A)(1).[10] The Article requires that the trial court consider that factor to be "the primary consideration." *Id*.

---

[10] Louisiana Civil Code Article 134 provides the "[f]actors in determining child's best interest" as follows:

A. Except as provided in Paragraph B of this Article, the court shall consider all relevant factors in determining the best interest of the child, including:

(1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.

(2) The love, affection, and other emotional ties between each party and the child.

(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

Maintaining her position regarding the occurrence of sexual abuse, Ms. Menard contends that "[i]t is abundantly clear that … there is certainly the potential for the child to be abused, even if the Court does not conclude that the abuse itself has been proved to have already occurred." She argues that, "[i]t is inconceivable that this amount of evidence could be generated" given the child's young age and there not be such "potential" for abuse. This potential, Ms. Menard suggests, both militates against joint custody and requires a continuation of Mr. Menard's limited physical custody.

The trial court's ruling, however, reveals specific reference to the primary consideration of La.Civ.Code art. 134(A)(1) and reflects the court's interest in that factor. The trial court explained:

> I asked … Dr. Bouillion, again, he's done three evaluations in this case. I asked him point-blank this particular factor, I said, "Dr. Bouillion, I said, in your opinion is there any potential for [the child] to be abused if I adopt your schedule of physical custody?" His answer, no, unequivocally no that's according to Dr. Bouillion.

That finding, as well as the trial court's ruling, reflects, not only a reliance on Dr. Bouillion's testimony, but credibility evaluations of all witnesses at trial. This court has explained:

> "The trial judge is in a better position to evaluate the best interest of a child from his observance of the parties and the witnesses and his decision will not be disturbed on review absent a clear showing of abuse." *Deason v. Deason,* 99–1811, p. 12 (La.App. 3 Cir. 4/5/00), 759

---

(14) The responsibility for the care and rearing of the child previously exercised by each party.

B. In cases involving a history of committing family violence, as defined in R.S. 9:362, or domestic abuse, as defined in R.S. 46:2132, including sexual abuse, as defined in R.S. 14:403, whether or not a party has sought relief under any applicable law, the court shall determine an award of custody or visitation in accordance with R.S. 9:341 and 364. The court may only find a history of committing family violence if the court finds that one incident of family violence has resulted in serious bodily injury or the court finds more than one incident of family violence.

So.2d 219, 220 (quoting *State in the Interest of Sylvester,* 525 So.2d 604, 608 (La.App. 3 Cir.1988)) (citing *Bagents v. Bagents,* 419 So.2d 460 (La.1982)).

> Every child custody case must be viewed within its own peculiar set of facts, and a trial court's award of custody is entitled to great weight and will not be overturned on appeal unless an abuse of discretion is clearly shown. *Connelly v. Connelly,* 94–0527 (La.App. 1 Cir. 10/7/94), 644 So.2d 789. Both the Louisiana Legislature and the Louisiana Supreme Court have made it abundantly clear that the primary consideration and prevailing inquiry is whether the custody arrangement is in the best interest of the child. *See Evans v. Lungrin,* 97–541, 97–577 (La.2/6/98), 708 So.2d 731.

*LeBlanc*, 953 So.2d at 119-20.

A complete and thorough review of this record supports the trial court's determinations regarding a lack of evidence of child sexual abuse of his daughter by Mr. Menard. Finally, this finding pretermits consideration of Ms. Menard's dependent argument advanced by the fourth assignment of error in which she requests that this Court enter judgment granting her sole custody due to the alleged abuse.

*Costs of Court*

Finally, Ms. Menard challenges the trial court's assessment of one-half of the court costs and the costs for Dr. Bouillion's in-person testimony to her. She contends that such an assignment is inequitable due to what she contends was an erroneous judgment. Given our above determination that the trial court's findings are fully supported by the record, we affirm the trial court's assessment of costs.

## DECREE

For the foregoing reasons, the September 24, 2018 judgment denying the motion to recuse and the February 20, 2019 judgment of custody are affirmed in their entirety. Costs of this appeal are assessed to the appellant, Kimberly Jeanne Champagne Menard.

**AFFIRMED.**